GOTHAM PARTNERS, L.P., a New York Limited Partnership, Plaintiff,

v.

HALLWOOD REALTY PARTNERS, L.P., Hallwood Realty Corporation, the Hallwood Group Incorporated, Anthony J. Gumbiner and William L. Guzzetti, Defendants.

Civ. A. No. 15754.

Court of Chancery of Delaware, New Castle County.

Submitted: June 18, 2003.
Decided: July 8, 2003.

Edward M. McNally, Michael A. Weidinger, Linda D. Martin, Mark W. Saltzburg, Morris, James, Hitchens & Williams, LLP, Wilmington, DE, for Plaintiff.

Michael D. Goldman, Stephen C. Norman, Matthew E. Fischer, Potter Anderson & Corroon, LLP, Wilmington, DE, for Defendants Hallwood Realty Corporation, The Hallwood Group Incorporated, Anthony J. Gumbiner, and William L. Guzzetti.

Elizabeth M. McGeever, Prickett, Jones & Elliott, Wilmington, DE, for Defendant Hallwood Realty Partners, L.P.

## OPINION

STRINE, Vice Chancellor.

In this case, plaintiff Gotham Partners challenged a series of transactions (the "Challenged Transactions") involving Hallwood Realty Partners, L.P. (the "Partnership"), a limited partnership whose units trade on the American Stock Exchange. Those Transactions resulted in the acquisition of more units in the Partnership by the parent corporation of the Partnership's general partner. Those units solidified the general partner's control because the Partnership Agreement requires a two-thirds vote to remove the general partner (the "Two–Thirds Removal Provision").

In its post-trial opinion,[1] this court held that one of the Challenged Transactions breached the contractually-imposed entire fairness standard contained in the Partnership's governing agreement; namely, the resale of 293,539 units to the parent of the general partner after the Partnership had acquired those units in an odd lot tender offer made at the same market price used in the resale (the "Odd Lot Resales"). The court, however, rejected Gotham's preferred remedy of rescission, finding that rescission was practicable but unwarranted. In lieu of rescission, the court

1. *Gotham Partners, L.P. v. Hallwood Realty Partners,* 795 A.2d 1 (Del.Ch.2001) (hereinafter Post–Trial Op., 795 A.2d at ——).

imposed a monetary remedy requiring the relevant defendants to pay damages based on an amount of $25.84 per unit, a price that was 82% greater than the $14.20 market price paid in the Odd Lot Resales.

On appeal, this court's liability finding was affirmed.[2] The Supreme Court, however, remanded the case because it concluded that this court had abused its remedial discretion by failing to account adequately for a control premium in its remedy award. Although the Supreme Court affirmed this court's denial of rescission, it ordered this court to come up with a remedy involving either monetary and/or equitable relief that compensated the Partnership for the increased security over control that the general partner achieved in the Odd Lot Resales.

In this opinion, I award such a remedy. The amount that I award is pegged to a value of $36.02 per unit. This constitutes a 154% premium over the market price paid in the Odd Lot Resales and represents a premium far in excess of what any other purchaser would have paid to the Partnership for the units. Using the total dollar figure I have awarded, I am confident that the general partner could have effected a non-coercive tender offer with the provision of full information to unitholders at a per unit price of the original damage award of $25.84 per unit and received tenders of units far in excess of the 293,539 units received in the Odd Lot Resales. Moreover, the general partner and its affiliates could have made market purchases akin to the number of units received in the Odd Lot Resales over a commercially reasonable period and would not have paid materially in excess of the original damage award. For all these rea-

sons, I believe that the award granted complies with the spirit of the remand and more than generously accounts for a control premium, when real world factors are taken into account.

## I. *Factual Background and Procedural History*

### A. *The Defendants*

The relevant defendants at this point are:

- Hallwood Realty Corporation, hereinafter referred to as the "General Partner";
- The Hallwood Group Incorporated ("HGI"), which is the parent of the General Partner and purchased the units in the Odd Lot Resales;
- Anthony J. Gumbiner, who is a director and the chief executive officer of the General Partner and HGI, and HGI's controlling stockholder;
- William Guzzetti, who is a director and the president of the General Partner, and an officer of HGI.

For the sake of simplicity, I refer to them collectively as the defendants, and ignore the other defendants in this case, who have already received a judgment in their favor.

The defendants collectively have an interest in securing the General Partner's control over the Partnership. The General Partner receives a healthy stream of fees from its management of the Partnership, which includes the payment of substantial salaries to Gumbiner and Guzzetti. By stipulation, Gotham agreed not to argue that the level of compensation paid to the General Partner for its management services was excessive, and it is bound by that agreement.[3]

---

**2.** *Gotham Partners v. Hallwood Realty Partners, L.P.,* 817 A.2d 160 (Del.2002) (hereinafter Sup.Ct. Op., 817 A.2d at ——).

**3.** Because of this stipulation and because of the absence of any evidence that the management costs of the Partnership are excessive, Gotham's attempt in certain of its arguments

Nonetheless, it is an important fact that the defendants benefit financially from control over the Partnership.

### B. *The Plaintiff — Gotham Partners*

This action was brought by Gotham Partners. Gotham Partners first bought into the Partnership in late 1994 and continued to buy until 1996. It took a pause at one point because it preferred to make other investments. It appears that Gotham bought into the Partnership in order to put it into play.

Gotham eventually bought at market prices[4] the maximum number of units (just short of 15% of the total units) that would not trigger the Partnership's poison pill. It then sought to cause the Partnership to take action, such as converting the Partnership into a real estate investment trust ("REIT"), that would, in Gotham's view, increase unitholder value. When its requests for action did not produce the desired response, Gotham eventually filed a books and records action and then this suit. Gotham brought these suits long after the Challenged Transactions had been completed, even though Gotham was aware of those transactions at the time they were executed. Instead, Gotham sat on its rights.

Throughout the course of this now lengthy litigation, Gotham never made a tender offer to acquire the rest of the Partnership. Instead, it fought on with this case, using it as a lever to cause the General Partner to put the Partnership in play or to convert to a REIT. By 2002, however, Gotham had fallen on extremely hard times.

In March 2003, shortly before the trial after remand, Gotham sold most of its stake to High River Limited Partnership, an entity controlled by Carl Icahn, for $80 per unit, a price nearly four times the average price Gotham had paid to buy the units it sold. Gotham retained the right to 50% of the profits that High River would make if it resold the units within three years. Gotham also retained a certain number of units so it could continue to press this case.[5]

During the time when trial in this case was imminent, High River made an unsolicited tender offer at $100 per unit. The General Partner has opposed that offer, and separate, expedited litigation is now pending regarding that response. High River has acknowledged its hope that this litigation gives it leverage in its takeover fight.

### C. *This Lawsuit and the Challenged Transactions*

Gotham Partners brought this action challenging the following transactions consummated by nominal defendant Hallwood Realty Partners, L.P. (the "Partnership"):

- *The "Reverse Split"* – A March 1995 five-to-one reverse unit split. In connection with the Reverse Split, HGI purchased 30,000 post-Split Units at $11.88 a unit, which was the market-based price tied to the issuance to HGI.

---

to imply that the management costs are too high or ought to be backed out of an analysis of the Partnership's value are improper and are not supported by the record. They will not be dealt with further in this opinion.

4. From October 1994 to September 1996, Gotham bought nearly 250,000 units at mar-

ket prices with an average price far less than the original damage award.

5. Without the potential to receive more payments from High River, Gotham's interest in its units would, it appears, be largely overshadowed by its desire to recoup the substantial attorneys' fees it has incurred to date.

- *The "Option Plan"* – A March 1995 unit option plan that granted 86,000 post-Split units to officers and employees of the General Partner, including HGI's controlling stockholders, defendants Anthony Gumbiner and the late Brian Troup. The 86,000 options constituted nearly 5% of the Partnership's 1,747,765 units, and were set at a market-based price tied to the issuance of the units.
- *The "Odd Lot Offer" and "Odd Lot Resales"* – A June 1995 odd lot tender offer in which the Partnership bought 293,539 post-Split units in blocks of fewer than 100 from June 5, 1995 to July 10, 1995 or over 16% of the Partnership's units. The Partnership then re-sold these to HGI for $4.1 million, or approximately $14.20 a unit – the identical price paid by the Partnership to unitholders, which was based on a market price formula. The Odd Lot Offer was exempt from the federal disclosure regulations that govern other tender offers. As a result, the unitholders were provided with no financial information in specific connection with the offer that they could use to evaluate the fairness of the Offer price.[6]

After the Odd Lot Resales and Reverse Split, HGI increased its holdings of the Partnership from 5.1% to approximately 25%. If the Options granted to its affiliates are included, HGI's control increased to approximately 30%. These percentages are important because of the Two–Thirds Removal Provision in the "Partnership Agreement."

HGI alleged that the Challenged Transactions were unfair to the Partnership's unitholders because they permitted HGI to pay an unfairly low price to acquire units that secured its unassailable control over the Partnership. In its complaint, Gotham alleged that the General Partner and its directors breached their fiduciary and contractual duties in effecting the Challenged Transactions.

The fiduciary duty claims against the General Partner were dismissed by an award of summary judgment because the Partnership Agreement's provisions supplanted the traditional default fiduciary duties that applied to the General Partner.[7] Thus, it was held that the validity of the Challenged Transactions and the liability of the defendants therefor depended on whether the Challenged Transactions were consummated in conformity with the Partnership Agreement.

The case then proceed to trial, with the focus being on whether the Challenged Transactions were effected in compliance with the Partnership Agreement. This court then issued its lengthy Post–Trial Opinion, which contains factual findings and legal conclusions this court still relies upon, except to the extent they were reversed by the Supreme Court. Because that is so, this opinion will not repeat all the liability determinations previously made nor all the facts underlying this remedy determination. Instead, this opinion will address the factual background more summarily, based on the understanding that the Post–Trial Opinion sets forth the facts more fully and that the reader is familiar with that prior opinion and the Supreme Court's opinion.

With that understood, the basic story is as follows. After trial, it was found that

---

6. The Partnership had filed regular quarterly and annual reports from which value determinations could be calculated.

7. *See Gotham Partners, L.P., v. Hallwood Realty Partners, L.P.* ("Gotham Summ. J. Op."), 2000 WL 1476663 (Del.Ch. Sept.27, 2000).

the Reverse Split and the Option Plan were consummated in conformity with the Partnership Agreement. This conclusion was not appealed and is final. Those Transactions left HGI and its affiliated officers with control over 11% of the Partnerships units, when options are included.

As to the Odd Lot Resales, the court rendered a different conclusion. Because the Odd Lot Resales involved the resale of existing, listed units to HGI, the court held that the transaction required approval by the General Partner's Audit Committee and had to be effected on terms no less favorable than could have been procured from a third-party comparable to HGI. The relevant contractual provisions implicated by the Odd Lot Resales were §§ 7.05 and 7.10(a) of the Partnership Agreement. Section 7.05 states that the Partnership "is expressly permitted to enter into transactions with the General Partner or any affiliate thereof provided that the terms of any such transaction are substantially equivalent to terms obtainable by the Partnership from a comparable unaffiliated third party." Section 7.10(a), meanwhile, states that the General Partner shall "form an Audit Committee ... comprised of two members of the board of directors who are not affiliated with the General Partner or its Affiliates except by reason of such directorship.... The function[ ] of the Audit Committee shall be to review and approve ... transactions between the Partnership and the General Partner and any of its Affiliates." The General Partner and its board failed to comply with these contractual requirements.

### D. *The Partnership* [8]

The Partnership was created in 1990 through the consolidation of a group of financially troubled real estate partner-

ships managed by Equitec Financial Group. HGI—through the General Partner—bought the general partner interest from Equitec. In a roll-up, unitholders were given the opportunity to exchange their pre-existing units for units in the Partnership, which were to be listed on the AMEX. The Equitec unitholders were told that units like the ones they were receiving typically trade at a steep discount to net asset value. They were also informed of the Two–Thirds Removal Provision and the depressing effect that provision could have on unit price. Eight of the Equitec partnerships accepted the offer and the Partnership was formed.

The Partnership began its operations with a portfolio of commercial and industrial real estate that was of less than prime quality. The portfolio included Class B and Class C office properties and industrial facilities. As a general matter, the portfolio facilities were also located in secondary markets.

In its early years, the Partnership was also plagued by litigation arising out of the Equitec era. That litigation was expensive and a drag on performance. This litigation came at a time when the Partnership and other real estate entities were grappling with a serious real estate recession. Years of unprofitability resulted, during which the General Partner struggled to get rid of unprofitable properties and maximize occupancy at its remaining properties. It disposed of many of its properties by deeding them in lieu of foreclosure to lenders.

By the time when the Challenged Transactions were first proposed—1994—the Partnership was performing somewhat better. While it had not yet demonstrated its ability to perform profitably on a con-

---

8. A more detailed history is found in the Post– Trial Opinion.

sistent basis [9] and still carried a very heavy debt load, the Partnership had right-sized its portfolio, endured a serious real estate recession, increased its occupancy rates, and reached a level of health whereby it was realistic to seek to refinance its debt on more favorable terms.

Its units were, however, trading at very low prices. Before the March 1995 Reverse Split, the units had traded in the $2 range. Although this price was higher than the lows that prevailed at the depth of the recession and there was no imminent threat of delisting, this $2 range price was not attractive to investors, particularly institutional investors. The Reverse Split had the effect of getting the unit prices above $10 a piece, a more attractive level.

And by the time of the Odd Lot Resales—the summer of 1995—the Partnership's solid occupancy rates and the recovery in the real estate markets made a favorable refinancing a likely possibility in the near future. Although the Partnership did not have a large amount of cash on hand, its cash position was not weak. As the court found in the Post–Trial Opinion, a well-motivated Audit Committee might well have put off the Odd Lot Resales until the time when the Partnership could finance the Odd Lot Offer itself.

Of course, the mere fact that the Partnership was doing better as of the summer of 1995 does not mean that it was in the pink of health. Although refinancing prospects were more promising, as of the time of the Odd Lot Resales they were not guaranteed. Nor was the real estate recovery firmly established. And the fact remained that the Partnership's portfolio was not made up of prime facilities in first-tier markets. The ability of the Partnership to generate profits on a regular basis had yet to be demonstrated.

Furthermore, the Partnership was a relatively small entity, having earnings before interest depreciation taxes and amortization ("EBITDA") of only $23.3 million for the year before the Odd Lot Resales. Thus, the Partnership was smaller than most publicly-listed real estate entities. Unlike REITs, the Partnership did not pay out regular distributions and did not have profits to distribute even if it wished to make pay-outs. Unlike REITs, the Partnership had an external management structure through the General Partner. These factors all tended to make the Partnership a less attractive investment relative to REITs.

This summary overview is all that I will impose on the reader. I do note that this summary far exceeds any presentation about the fundamentals of the Partnership that was presented on remand by the parties. Gotham, in particular, presented a financial expert, who deliberately eschewed any close examination of the Partnership's actual performance or characteristics.

### E. The Court's Original Post–Trial Decision

As the Post–Trial Opinion points out, the defendants did not comply with §§ 7.05 and 7.10 of the Partnership Agreement in large measure because they acted as if the Odd Lot Resales were governed by another portion of the Partnership Agreement dealing with the issuance of units. If the Odd Lots had been issued to HGI, the Partnership Agreement would have permitted the use of a market price average except in egregious circumstances

---

**9.** In fact, it suffered losses of over $18 million in 1994 and continued to have negative cash flow into 1995.

and no Audit Committee approval would have been required.

Because §§ 7.05 and 7.10 applied, however, and were not complied with, the Partnership Agreement was not honored. But I denied Gotham's requested relief of rescission, finding that Gotham had unreasonably delayed in bringing suit and that the General Partner had not sought to injure the Partnership by effecting the Odd Lot Resales.

As an alternative to the unwarranted remedy of rescission, I awarded monetary damages. Because of the breach of the Agreement's contractual entire fairness standard, I presumed that injury to the Partnership occurred. In that regard, I noted that a well-motivated Audit Committee might not have gone forth with the Odd Lot Resales because the acquisition of 293,539 units by HGI gave the General Partner an almost unbeatable hand in a proxy fight. This conclusion was buttressed by several factors, not the least of which was the Two–Thirds Removal Provision.

The Post–Trial Opinion did not assume that the General Partner had no control before the Odd Lot Resales. Instead, it recognized that while the General Partner had already purchased control and was already in a strong position given its existing unitholdings, the two-thirds removal threshold, and other provisions of the Partnership Agreement giving it defensive leverage,[10] there was still a difficult, but real, opportunity for an insurgent to unseat the General Partner through a proxy contest. The units acquired in the Odd Lot Resales took what was a very difficult endeavor and turned it into a practical impossibility.

As such, the Audit Committee might have concluded not to go forward with the Odd Lot Offer until such time as the Partnership itself could buy the units. Or, alternatively, it could have demanded a premium in excess of market to account for the increased level of security that the General Partner would acquire. In addition, the court noted that the Audit Committee might have sought to use other indicators of value to obtain a higher price in negotiations. Because the Audit Committee had not functioned independently and thus had not considered these relevant factors, the court crafted a remedy designed to redress this harm.

Therefore, the court awarded damages amounting to an 82% premium over the market price paid in the Odd Lot Resales. The court had to fashion this damages award on a record devoid of any formal valuations of the Partnership. Gotham did not present any damages calculation and instead pressed for a rescission remedy. In view of Gotham's default and the denial of its request for rescission, the court worked with the limited evidence it had and put the burden of uncertainty on the defendants:

> Much of the uncertainty that surrounds the question of what damages should be awarded is the fault of the defendants. Had the defendants conducted a contemporaneous market check, there would be real-world evidence of what a third party might have paid.

> Likewise, the failure of the defendants to have the Audit Committee review and approve the Odd Lot Offer also bears on the proper remedy. A properly func-

**10.** These include the ability to determine whether new unitholders will be admitted as voting limited partners. Others include the ability to issue new units to itself at market and provisions of the Partnership Agreement capacious enough for the implementation of a poison pill.

tioning Audit Committee would have compared the relatively modest benefits of the *Odd Lot Offer* for the Partnership with the lock on control that HGI would receive. Such an Audit Committee might well have decided that the Odd Lot Offer's benefits were far too slight to justify depriving unitholders of the effective ability to remove the General Partner, unless HGI paid for that deprivation with a hefty premium. In the alternative, the Audit Committee might have pressed management to use the Partnership's cash on hand to retire the Odd Lots for the benefit of all unitholders, or to defer the Odd Lot Offer until that could be done. Finally, the Audit Committee might have demanded a real market check.

None of these things were done. Instead, HGI was permitted to purchase a large number of units at a low price and thereby insulate the General Partner from any realistic threat of removal.

I conclude that it is more likely than not that the Partnership could have obtained a better price from HGI or another party than was paid in the Odd Lot Offer, had the defendants complied with their contractual duties. There were other possible purchasers. The Partnership units were trading at a steep discount to NAV. The Partnership's prospects and performance were improving—a conclusion buttressed by HGI's own self-interested decision to go forward with the Odd Lot Resales in May 1995, when it had declined to do so in October, 1994.

There is, admittedly, some plausibility to the defendants' arguments that no purchaser would have paid a premium to buy a minority block in view of the General Partner's authority under the Agreement. *See* Agreement § 13.05

(permitting general partner to determine if unitholders get to become limited partners with voting rights); *see* *Gotham S.J. Op.*, mem. op. at 26–27 (discussing this power). Moreover, Gotham's comparables are not wholly comparable. Nonetheless, it must be remembered that the Audit Committee was not bound to approve the Odd Lot Offer at the bare minimum price level conceivable under § 7.05. It could have taken into account the fact that the Odd Lot Resales were of particular advantage to HGI and demanded value for that advantage in exchange. After all, the Odd Lot Resales solidified HGI's control. And HGI, unlike other purchasers, was able to use its control of the General Partner to determine when the Partnership should liquidate its assets, and therefore did not face the same liquidity problems a non-controlling purchaser would have.[11]

Although the original damage award suffered from the sort of imprecision that tends to afflict all after-the-fact financial calculations of value, the award seemed a realistic one, albeit at an 82% premium to market that HGI likely would never have agreed to pay in order to fund the Odd Lot Offer.

## II. *The Appeal and the Remand Order*

Gotham appealed certain rulings contained in the Post–Trial Opinion. The defendants filed a cross-appeal.

Gotham argued that this court properly held the defendants liable but that it had erred by failing to grant its preferred remedy of rescission. In the alternative, Gotham argued that the monetary remedy the court entered was inadequate and that this court had abused its discretion by failing to grant rescissory damages, to

---

11. 795 A.2d at 36–37.

sterilize HGI's voting power acquired in the Odd Lot Resales, or to award a control premium. For their part, the defendants argued that the liability finding was improper because the Odd Lot Resales were consummated in accordance with § 9.01(b) of the Partnership Agreement, which dealt with issuances.

The Supreme Court's decision rejected the defendants' cross-appeal, finding that the Odd Lot Resales were subject to §§ 7.05 and 7.10(a) of the Partnership Agreement and that those sections had not been satisfied.

The Supreme Court also rejected the primary argument Gotham advanced on appeal, which was that this court erred by denying its request for rescission. In so ruling, the Supreme Court took note of the fact that this court's denial of rescission did not rest on the ground that rescission was impracticable—it was practicable then and remains so today—but on the ground that rescission was unwarranted when two factors were considered. Those factors were that:

(1) Gotham delayed bringing suit for an injunction or rescission until it "tested the waters" and the Partnership's publicly listed units rose in value; and

(2) The Odd Lot Resales was not a "conscious scheme to entrench the General Partner's control and enrich HGI through the sales of Partnership units on the cheap in deals effected without procedural safeguards or full disclosure." [12]

But the Supreme Court did find favor with some aspects of Gotham's argument on appeal. To wit, the Supreme Court found that this court's alternative remedy of monetary damages did not adequately compensate the Partnership for the solidification of control that HGI obtained as a result of the Odd Lot Resales:

> Although the Vice Chancellor found that the defendants did not intend for the General Partner to become entrenched or HGI to be unjustly enriched, the Odd Lot Resales had that effect. The Court of Chancery was thus required to remedy that effect by compensating the limited partners for a control premium. As the Vice Chancellor recognized, the Audit Committee—whose contractually-mandated functions were not implemented—conceivably would have "taken into account the fact that the Odd Lot Resales were of particular advantage to HGI and demanded value for that advantage in exchange" because the "Odd Lot Resales solidified HGI's control." [13]

The Supreme Court concluded that this court erred by inadequately taking these factors into account because the Supreme Court perceived that the monetary damages award did not include a control premium, even though that award required the defendants to pay an amount 82% over the market price paid in the Odd Lot Offer.[14] In addition, the Supreme Court found that this court abused its discretion by failing to "address and decide the applicability of rescissory damages." [15] The Court remanded the case for a new remedy determination centering on the following tasks (the "Remand Order"):

> First, the Court of Chancery should seek to quantify how the challenged transaction would have been consummated had the defendants adhered to

---

12. Sup.Ct. Op., 817 A.2d at 174 (quoting Post–Trial Op., 795 A.2d at 36).

13. Sup.Ct. Op., 817 A.2d at 177 (quoting Post–Trial Op., 795 A.2d at 37).

14. Sup.Ct. Op., 817 A.2d at 177.

15. Sup.Ct. Op., 817 A.2d at 177.

the Partnership Agreement's contractual entire fairness provisions. *Specifically, the court should determine and consider what price the Audit Committee would have approved for the Odd Lot Offer resales to HGI if the Audit Committee had been aware that the transaction would result in HGI solidifying control over the Partnership.* Second, the Court of Chancery should reconsider and award some form or combination of the various equitable remedies available to the limited partnership, including rescissory damages, sterilization of voting rights, *and other appropriate methods of accounting for a control premium.* We note that the Court of Chancery *has the discretion* to consider afresh in light of the above analysis whether or not to order rescission.[16]

### III. *The Meaning of the Remand Order*

The parties have sparred over the meaning of the Remand Order. Gotham's deconstructionist reading is that the Remand Order is an implicit order to this court to revisit and change its denial of rescission as a remedy. Alternatively, it reads the Remand Order as requiring me to engage in a "counterfactual" determination of past history, whereby I attempt, by retroactive application of some sort of financial game theory, to scope out the terms on which a transaction between the Partnership and HGI would have occurred had the Audit Committee been properly charged as to its responsibilities.

By contrast, the defendants read the Remand Order as requiring this court to fashion a remedy that takes into account the degree of control that was transferred to HGI in the Odd Lot Resales. That degree of control should be used, in combination with an assessment of the value of the Partnership at the time of the Odd Lot Resales, to come up with a damages award that adequately includes a control premium.

My reading of the Remand Order is closer to that of the defendants than to that advanced by Gotham. It is impossible for me to determine exactly how a properly conducted negotiation between HGI and the Audit Committee would have transpired in the summer of 1995 when the Odd Lot Resales took place. Indeed, I agree with Gotham on one central point: I do not believe that the Odd Lot Resales would have transpired if HGI and the Audit Committee believed that §§ 7.05 and 7.10 applied.

I disagree with Gotham, however, about the reasons. Gotham is probably right that one reason is that the Audit Committee, had it acted properly, would have concluded that the Odd Lot Offer should have been postponed until such time as the Partnership itself could fund it. Because of the entrenching effect the Resales would have on the General Partner's control, a properly motivated Audit Committee would likely have delayed the Offer (which had only modest cost-saving potential for the Partnership) until a later date.

But another equally important reason existed as to why the Odd Lot Resales would not have transpired. Under the Partnership Agreement, the General Partner and its affiliates were entitled to purchase units in the marketplace. Focus for a moment on that right alone and ignore the additional contractual discretion the General Partner has to issue itself units at the prevailing market price.

The reality is that HGI would likely have refused to fund the Odd Lot Offer had it been required to pay the 82% premium this court originally awarded after tri-

---

**16.** Sup.Ct. Op., 817 A.2d at 177–78 (emphasis added).

al. This refusal would have been rational because it could have made substantial purchases in the market over a commercially reasonable time frame, subject only to securities law restrictions, at a price less than that. As Gotham's own large market purchases show, it was possible during the relevant time period to buy in the market without paying prices akin to this court's original damage award.[17]

For these reasons, the remedy I am constructing is not premised on the conclusion that the Odd Lot Resales would have transpired had the Partnership Agreement been honored. Rather, the remedy attempts to compensate the Partnership for the injury that resulted from a transaction that did not comply with the Agreement and that would likely not have transpired had the parties understood the contractual strictures under which they were operating.[18]

To determine the appropriate remedy in a rational manner, I understand the Remand Order as requiring me to evaluate the available evidence regarding the value of the Partnership as of the time of the Odd Lot Resales and the solidification of control achieved by the General Partner. Based on that evidence, I am to fashion a

remedy that accords the Partnership fair value. This task does not involve hypothesizing how negotiations that did not occur might have gone; rather, it involves looking at financial data and the degree of control obtained and making a discretionary determination of an appropriate remedy.

Like the defendants, I also do not read the Remand Order as requiring me to grant rescission, rescissory damages, or a sterilization of HGI's voting rights as to the units it obtained in the Odd Lot Resales. The primary emphasis of the Supreme Court opinion is on fashioning a remedy for the increase in control HGI obtained. That this can be done through an award of damages including a control premium is evidenced by the Supreme Court's repeated emphasis on the need for a remedy that "accounts for a control premium." [19]

Therefore, the primary focus of this opinion will be upon fashioning a damages award that properly accounts for a control premium. Before turning to that task, I will first explain why I am not revisiting my previous denial of rescission or granting rescissory damages.[20]

---

17. I do not find that the General Partner could have purchased 293,539 units at one time without altering the market at all. But I do conclude that HGI could have made substantial purchases, as Gotham did, without paying a large premium to pre-existing market price. The Odd Lot Offer itself also supports this conclusion. Although the Odd Lot Offer resulted in upward price movement, that movement did not involve large increments.

18. I therefore do not impose a remedy on the assumption that HGI might have purchased as many as 55% of the units in the Odd Lot Resales, the maximum estimate of Partnership Odd Lots owned. I value the Odd Lot Resales that actually occurred.

19. Sup.Ct. Op., 817 A.2d at 178; *see also id.* at 177 ("required to remedy [entrenching] effect by compensating the limited partners for a control premium"); *id.* at 164 ("the trial court did not account properly for a control premium in its remedy calculation").

20. In very unhelpful submissions, the parties have sparred over who bears the burden of proof. In the original Post–Trial Opinion, I held that the defendants bore the burden to show compliance with §§ 7.05 and 7.10. At this stage, it is not apparent to me what it means to have the burden of persuasion. I have held that the Partnership suffered cognizable injury and the Supreme Court has upheld that determination. I must now craft from that finding a remedy using the full degree of discretion afforded me as a judge of

## IV. *Rescission and Rescissory Damages*

Having considered the evidence presented on remand and engaged in the analysis set forth in the latter parts of this opinion, I have determined not to revisit my previous decision to deny rescission. That decision remains my discretionary determination for the same reasons as previously identified, and as accepted by the Supreme Court.[21]

█ I turn then to what I regard as an obvious result of that determination, which is that I am not awarding rescissory damages. Before explaining why I am not awarding rescissory damages *now*, it is necessary to explain why I did not award rescissory damages *then*, i.e., in the Post–Trial Opinion. There were two major reasons.

First, rescission was a practicable remedy as of the time of the Post–Trial Opinion and remains so today. HGI has the units (or enough replacement units) to trade back to the Partnership in exchange for the cash (plus interest) paid in the Odd Lot Resales. For that reason, Gotham sought rescission as its preferred remedy in the first trial.

█ Because rescission was practicable, I – as the Supreme Court found – denied that remedy as unwarranted. Because rescission was found to be unwarranted, an award of rescissory damages was also unwarranted. The reason that is so is simple. Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable. A solid body of case law so holds.[22]

Rescissory damages were not considered in the Post–Trial Opinion for a separate reason: *Gotham never requested them.* The discussion of rescissory damages in Gotham's original pre- and post-trial briefs and in its original expert reports is cited in its entirety below:[23]

This blank space is not an error. The space is filled with what the court received

---

this court. *See* Sup.Ct. Op., 817 A.2d at 175–76 (describing breadth of that discretion). In so doing, I err on the side of generosity, given the defendants' violation of the Partnership Agreement, the self-dealing nature of the Odd Lot Resales, and the spirit of the Remand Order. *Id.* at 175–77 (noting the need for an adequate remedy for loyalty violations generally and in this case, in particular). It is on that basis that I make my remedial decision, one that is favorable to Gotham but has little to do with who has the burden to persuade me that a particular remedy ought or ought not be entered. Regardless of who bears the burden, my ruling would not change as I am not paralyzed in mental equipoise on any issue.

21. Gotham's sale of its units to High River does nothing to alter my previous conclusion. The fact that Gotham sold does not relieve the defendants of the risks and lost opportunities they suffered as a result of Gotham's torpidity in filing suit, nor does it affect in any way the other factor that supported my denial of rescission.

22. For a small sample of the authority so stating, see *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del.Ch.1994) (rescissory damages are appropriate "when equitable rescission of a transaction would be appropriate, but is not feasible"), *aff'd*, 663 A.2d 1156 (Del.1995); *Nebel v. Southwest Bancorp, Inc.*, 1995 WL 405750 at *2 (Del.Ch. July 5, 1995) (same); *Catamaran Acquisition Corp. v. Spherion Corp.*, 2001 WL 755387, at *4 (Del.Super. May 31, 2001) (same); 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12–4(b) (2001) (same).

23. Gotham Pre–Trial Briefs, *passim;* Gotham Post–Trial Briefs, *passim;* Gotham Expert Reports, *passim.*

from Gotham, which was nothing. Gotham did not seek rescissory damages as is evidenced by its total failure to argue the issue or to present any calculation of what those damages might have been.

Regrettably, in its appeal Gotham represented to the Supreme Court that it had fairly presented the issue below. On remand, Gotham belatedly admitted that that was not the case.[24] Therefore, acting on the mistaken premise that Gotham had fairly presented the issue, the Supreme Court held that this court had abused its discretion by failing to consider a demand for damages that was never made below.

At this stage, however, I deny Gotham's request for rescissory damages not because it was waived—which I believe it was before its erroneous appellate briefs revived its moribund claim—but because the reasons underlying my denial of rescission as unwarranted also support the denial of the economically equivalent relief of rescissory damages.

## V. *The Parties' Presentations on Remand*

On remand, this court opened the record to allow the parties to present expert evidence addressing the remedial issues not-ed in the Remand Order. As a result, a fuller record about value was created, due largely to the defendants' efforts.

For its part, Gotham continued to present a case focused on rescission, as evidenced most obviously by its failure to present any expert who had prepared a formal valuation of the Partnership. Instead, Gotham presented two expert witnesses, whose combined testimony was intended to show that the Odd Lot Resales would not have occurred at all had the Partnership Agreement been honored.

■ The reason that I infer that Gotham's goal remains rescission is that its key expert, Adam Markman, a partner at Green Street Advisors, opined that a fair award of monetary damages would be based on a value range of $136 to $273 per unit, or a total of $40 to $80 million in damages, before interest—an 858% to 1823% premium to market. The assumption that both Markman and his counterpart, Professor Ronald Gilson,[25] made is that HGI should have paid a value for the 293,539 Odd Lots equal to the full net present value as of July 1995 of the General Partner's expected cash flows (as estimated by Gotham)[26] as General Partner

---

24. *Cf.* Del.Supr. Ct. R. 8.

25. The defendants attack the admissibility of Professor Gilson's testimony for lack of reliability. I agree with them that aspects of Professor Gilson's testimony (*e.g.*, about expected voting behavior) was not adequately grounded in empirical research or actual experience and I have given no weight to those aspects of his testimony. Rather than parse through each excludible subject in his report, I heard Professor Gilson's testimony as an offer of proof. I now admit it solely for its general commentary on appropriate corporate governance standards and corporate finance principles and their relevance to the facts of this case. Although these topics involve a high degree of subjectivity, Professor Gilson is a distinguished scholar in these areas and he grounded his testimony in the basic literature of those fields, with which he is well familiar, having written a good deal of it himself. Although his testimony as to the correct remedy was not, on balance, convincing to me, it was helpful to hear his expert views and his testimony was sufficiently tied to social science literature to pass the reliability threshold. In so ruling, I note my general view that social science testimony is, by nature, more imprecise than testimony based on the physical sciences.

26. They valued this interest at $26 million. This, in my view, was based on a very aggressive multiple of projected earnings. *See* Tr. I at 365 (Markman admitting that he usually values cash streams at a 4 to 6 multiple, not the 10 multiple he used here). It also assumed that the General Partner had no pre-

(the "Gotham General Partner Value"), plus a per unit price pegged to 100% of the Partnership's net asset value. To avoid double-counting, they offset this formula by backing the Gotham General Partner Value out of the Partnership's NAV for purposes of calculating the per unit price. Even so, this approach produces a damage award that I believe is otherworldly and highly unrealistic.

The defendants took a more traditional approach. They presented a valuation expert, Arthur Rosenbloom of CFC Capital LLC. Rosenbloom valued the Partnership as of the date of the Odd Lot Resales using three primary methods: (1) a discounted cash flow analysis; (2) a comparable companies analysis; and (3) a net asset value or "NAV" analysis. Rosenbloom supplemented those methods by considering the control premiums being paid in change-of-control transactions involving real estate entities during the period in which the Odd Lot Resales transpired. Taken together, these analyses led Rosenbloom to conclude that a damage award of no higher than $28.13 per unit would be reasonable. That constituted a 98% premium over the market price paid in the Odd Lot Resales and a 16% premium over the base value of the units generated by his valuation exercise.

To buttress their case, the defendants also presented the testimony of Alan Miller, of Innisfree M & A Incorporated, a leading proxy solicitation firm. Miller testified that the General Partner faced no realistic threat of removal by a proxy fight before the Odd Lot Resales. Given the lack of institutional ownership and the heavy and dispersed retail ownership of Partnership units, expected voting patterns, and other relevant factors, Miller

existing degree of control, when, in fact, it already had a secure, if not wholly invulnera-

opined that there was only a 1% chance of achieving the two-thirds vote required to remove the General Partner before the Odd Lot Resales. After the Odd Lot Resales, Miller opined that removal via a proxy fight was a practical impossibility.

Miller's testimony was designed to show that any control premium that HGI should have paid was modest because, at best, the General Partner was increasing its already firm grip on control only marginally.

## VI. The Court's Framework for Analysis

As noted, Gotham declined to present an expert who actually valued the Partnership. By contrast, the defendants put on a qualified expert, Rosenbloom, who used a logical and accepted range of valuation methods. I thus adopt Rosenbloom's framework as the general basis for formulating my remedy, but supplement it by giving weight to another factor: the market price of the Partnership's units. I generally adopt Rosenbloom's analyses as soundly reasoned except where I depart from them.

I address those analyses in the following order: (a) comparable companies; (b) discontinued cash flow; (c) net asset value; and (d) market price. I then adjust the results to add an additional control premium on top of the resulting amount, which already represents a large premium to market.

### A. Comparable Companies Analysis

As is usually the case, the primary debate about the comparable companies analysis presented by the defendants is whether the comparables are really comparable and whether or not Rosenbloom's decision

ble, position.

to adjust the resulting median multiple was reasonable. In identifying his comparables, Rosenbloom came up with four criteria:

Comparative companies were selected on the basis of the following criteria:

a. Each was a U.S. corporation or partnership operating principally as an owner and operator of income-producing real estate properties.

b. The common stock or partnership interests of each was listed on a national exchange or the NASDAQ National Market in June 1995, had attracted sufficient investor interest to warrant its inclusion in Standard & Poor's Stock Guide, and traded at a price in excess of $2 per share or unit.

c. Each business had latest year revenues in excess of $25 million.

d. No business was making a cash distribution that would constitute a yield of 3 percent or greater.[27]

■ Gotham principally challenges the fourth criterion, which is that the comparison companies not be making cash distributions constituting a yield of three percent or greater. Gotham contends that the actual cash distribution policies of firms is irrelevant to value and that the appropriate universe should have included a large number of REITs with cash distributions above that limit.

I reject this challenge. Whatever the theory is, the record evidence demonstrates that in the real world, investors are sensitive to distribution policies, and real estate companies that do not make regular distributions, tend to trade at steeper discounts than companies that do. The reality is that a segment of investors does look

for current yield.[28] Here, the Partnership was not providing any current yield at all, nor was it well positioned at the time of the Odd Lot Resales to guarantee one in the near future. Thus, I find that Rosenbloom's use of this criterion was appropriate, and adopt it.

■ Gotham challenges two of Rosenbloom's selected comparables. First, Gotham says that one of the comparables, the Carl Icahn-controlled American Real Estate Partners, L.P., should have been excluded because it was in different businesses than the Partnership and had recently raised over $100 million in capital for future investment. American Real Estate Partners was an NYSE-traded limited partnership that was larger than the Partnership and also invested in commercial real estate properties in several states.

I agree with the defendants that American Real Estate Partners should not have been excluded. Like any comparable, it was not identically situated to the Partnership, but it was of real comparative value and its acquisition of capital to fuel growth should not have depressed its trading multiple. The principal basis for Gotham's objection seems to be that American Real Estate traded at a relatively low multiple of 6.2 times its EBITDA.

Gotham's other objection is that Rosenbloom excluded from his analysis one comparable, Catellus Development, on the ground that it owned a large quantity of undeveloped land that made it incomparable. As it happens, Catellus traded at large multiple of 19.7% to EBITDA. Because Rosenbloom excluded Catellus, the median multiple his analysis generated to EBIT-

---

27. JX 609 at 16.

28. Investors interested in current income and high yields would seem particularly attracted to REITs, which are required to pay out nearly all their income. In this regard, see *infra* note 38.

DA was 9.1% rather than 10.0%. Rosenbloom then discounted that median by 5% based on the Partnership's "generally inferior financial performance relative to the comparative companies, particularly with regard to profit margins and trends in revenues and equity ..." [29]

I agree with Gotham that Catellus should not have been excluded. The basis for its exclusion also logically applied to American Real Estate, which had recently obtained a large amount of non-income-producing cash to make future investments. Either Rosenbloom should have kept both or excluded both.

■ For purposes of this decision, I include both, which results in a median multiple of 10.0 to the last twelve month's EBITDA.[30] Unlike Gotham, however, I accept that this median should be adjusted modestly to account for the Partnership's weaker status relative to the comparables. Reasonable adjustments to medians are an acceptable part of a comparable companies analysis.[31] Using an adjusted multiple of 9.5 results in a per unit value of $36.16. That represents a 155% premium to the market price paid in the Odd Lot Resales.

### B. Discounted Cash Flow Analysis

■ Rosenbloom also conducted a discounted cash flow ("DCF") analysis. In its briefs, Gotham challenges that analysis on several grounds but did not present its own DCF valuation. The Rosenbloom analysis generated a per unit value of $23.54 a unit. I am generally satisfied that the Rosenbloom analysis is a sound framework, taking into account the degree of subjectivity that infects any valuation exercise.

But I agree with Gotham that Rosenbloom was overly aggressive on one point in a manner that favored his client. In conducting his DCF, Rosenbloom treated the Partnership as if it was a private company. He ignored the Partnership's own ascertainable "beta" on the ground that the thin trading in Partnership units and other market factors made the Partnership's beta an unreliable factor in determining the appropriate cost of capital. The literature that the defendants submitted to support this approach is, at best, faintly supportive.[32] Yet, Gotham's own arguments about the lack of reliability of the Partnership's trading price as an indicator of value intuitively support Rosenbloom's judgment that the Partnership's own beta did not reflect what its beta would be had the units been more actively traded.

To compensate for this factor, Rosenbloom derived a beta by looking at comparable companies and then calculating a leveraged beta for the Partnership that took into account its capital structure. In valuing a private company, this move

**29.** JX 609 at 19.

**30.** If I had excluded both, the resulting median would 10.05 rather than 10.0, a very modest difference.

**31.** See, e.g., Shannon Pratt, The Lawyer's Business Valuation Handbook: Understanding Financial Statements, Appraisal Reports, and Expert Testimony 1294–1300 (Am. Bar Ass'n 2000). Of course, the more the appraiser deviates from the medians the more biased and subjective the analysis arguably becomes. See Bradford Cornell, Corporate Valuation, 65–69 (McGraw–Hill 1993) (discussing the acceptability of giving less than equal weight to certain companies or factors in determining the final multiple but warning that the greater the deviation from the medians and means the more likely the appraiser is to be accused of "cherry picking" the data).

**32.** See Defs.' Br. at 49 (citing Robert F. Reilly & Robert P. Schweihs, The Handbook of Advanced Business Valuation 13–14 (McGraw–Hill 2000)).

would be considered standard. What is not so standard is applying it to a public company, whose beta is derivable from market information.

The effect of Rosenbloom's approach was to increase the Partnership's leveraged beta from its published level of 0.63 to 3.35, a very large increase. The published level indicated that the Partnership's cost of equity would be less than that of the market as a whole; the Rosenbloom-calculated beta resulted in a cost of equity much higher than is expected from that of the market as a whole.

█ Rosenbloom then compounded this adjustment by adding "company specific" (3%) and "small stock" (4%) adjustments to his cost of equity calculus. This resulted in a cost of equity capital of 38%. Equity comprised 13.7% of the Partnership's overall capital structure. When considered along with his reasonable estimate of cost of debt of 9%,[33] and the fact that debt comprised the remaining 86.3% of the Partnership's capital, Rosenbloom came to a weighted average cost of capital ("WACC") of 13.0%.

Gotham challenges all of these adjustments, contending they are unjustifiable.

I agree with its criticism in part. Without pretending to be a finance professor, the evidence and literature presented do not convince me that it was *per se* improper for Rosenbloom to reject the Partnership's beta and calculate a beta based on comparable (or guideline) companies.[34] Given what Gotham itself contends was an "inefficient" market in the Partnership's units and given the heavy debt the Partnership carried, the judgment that the Partnership's published beta was out of line strikes me as reasonable.

What I believe unreasonable, though, is compounding that substantial adjustment to beta – based on firm specific characteristics of the Partnership – with the further addition of small company and specific company adjustments. Although such adjustments have been accepted in certain decisions of this court involving different circumstances, I find them to be inappropriate here. The adjustment to beta alone was sufficient to account adequately for those factors. Backing them out of the Rosenbloom analysis reduces his WACC to approximately 12.0%,[35] yielding a per unit value of $35.00. That is a 146% premium

---

**33.** This estimate was slightly lower than the Partnership's cost of debt at the time of the Odd Lot Resales and was in line with the cost of debt in the refinancing it obtained later in 1995.

**34.** In the first appraisal opinion in the epic *Technicolor* case, Chancellor Allen accepted the use of a beta based on comparable companies as part of a DCF valuation of a division of Technicolor, despite the fact that Technicolor's shares were publicly traded and its beta could be calculated based on market evidence. *See Cede & Co. v. Technicolor, Inc.,* 1990 WL 161084, at *29 n. 52 (Del.Ch. Oct.19, 1990). Although one cannot be certain, it appears that the Supreme Court's reversing opinion did not call this judgment into doubt. *Cede & Co. v. Technicolor, Inc.,* 684 A.2d 289 (Del.1996).

**35.** This flows from the reduction in the cost of equity in the WACC calculus from 38% to 31%. The latter number is not an unreasonable one given the Partnership's history, its Class B properties, small cap status, and high debt. Gotham's own behavior reinforces this conclusion because it eschewed pursuing investments in the Partnership between October 1994 and May 1995, having concluded that possible participation in a group seeking to "lend money to Rockefeller Center Properties" (*i.e.,* seeking a return on debt as a lender) was more attractive than the return it could then achieve as an equity investor in the Partnership. Ackman Dep. at 460 (Defs.' App. at B–1330).

over the market price paid in the Odd Lot Resales.

## C. *Net Asset Value*

■ During the first trial in this case, Gotham presented the testimony of Robert Stanger, an expert on real estate limited partnerships. Stanger presented a net asset valuation of the Partnership of $60.72 per unit. In his testimony, however, Stanger did not take the position that the value of Partnership units equaled 100% of NAV. He recognized that the units of real estate limited partnerships often trade at steep discounts to NAV. Thus, Stanger presented a list of tender offers to acquire positions in real estate limited partnerships during a period relevant to that in which the Odd Lot Resales occurred. Stanger's list showed that the average price of these tender offers was at 64% of NAV.

At this stage, Gotham's position on NAV has changed. It now argues that the Partnership's units should be valued at 100% of NAV. It largely bases this on the testimony of its expert, Adam Markman. Markman's firm, Green Street, keeps an index of REITs that tracks the price that select REITs trade in comparison to, among other things, NAV. According to Markman, Green Street's data shows that there should be no discount from NAV in valuing Partnership units.

By contrast, Rosenbloom testified that there should be a 60% discount from the Stanger NAV of $60.72, producing a value of $24.29. He contended that this discount is warranted by evidence showing that two of the comparables he used in his compara-ble companies analysis (Catellus and National Realty) were trading at 44% and 22% of NAV.

Even more important, Rosenbloom notes that the Partnership is significantly different from a REIT. A REIT is obligated to distribute its income, whereas the Partnership is not, and never made distributions during the relevant time period. Furthermore, Rosenbloom contends that the Partnership was in a much weaker position than the REITs used in Green Street's index, making its trading data largely irrelevant.

In that regard, Rosenbloom's report notes a variety of factors that tend to cause units to trade at a discount to NAV, including large amounts of debt relative to cash flow, low levels of income distributions, a lengthy time period to dissolution or liquidation, and partnership agreement provisions protecting the general partner from removal.[36] All of these factors were applicable to the Partnership and tended to increase the size of the discount from NAV one would expect.[37]

After considering the evidence, I adopt neither Gotham's nor Rosenbloom's value. I agree that Gotham's contention that the Partnership should be valued at 100% of NAV is incredibly aggressive and at odds with a fair reading of the market evidence. On the other hand, Rosenbloom's suggested discount is too steep. I address each of these conclusions now, starting with the reasons I do not adopt Gotham's approach.

I reject Gotham's "100%" tack for several reasons. First, it is largely based on a

---

36. JX 609 at 20 (citing Shannon P. Pratt, *Valuation Discounts and Premiums* 287 (John Wiley & Sons 2001)).

37. The Partnership was highly leveraged, had experienced difficult times in recent years, did not make distributions, was not due for dissolution for nearly one hundred years and could not be dissolved without General Partner approval and a majority unitholder vote, the General Partner could only be removed by a two-thirds vote, and had other substantial protections.

set of firms that are very different from the Partnership. Those firms paid out regular distributions and often had very high yields.[38] They were larger than the Partnership. They had corporate governance structures that did not involve external management by a corporate general partner. The Partnership was just that: a Partnership and a non-distributing one at that. It had external management, a factor that Markman says depresses investor interest.

Second, Markman admitted that some of the firms in the Green Street REIT index trade at a steep discount to NAV. He also admitted that Green Street has a list of criteria that it uses in determining how to value a particular REIT's units in comparison to NAV. *But Markman failed to apply his firm's criteria to the Partnership in reaching his conclusion that the Partnership should trade at 100% of NAV.* Indeed, Markman essentially conceded at trial that the Partnership fared poorly, based on his own firm's criteria, compared to an entity, Reckson Associates, which went public in May 1995 at a 13% discount to NAV.[39] Reckson was paying out a high yield, had less debt, owned prime Class A real estate, and its management structure and reputation were superior.[40] The Partnership also fares badly on these criteria in comparison to Carr Realty, a REIT in the Green Street universe that traded at a 24% discount to NAV. Taken in its entirety, Mark-

man's testimony amounted to a concession that the Partnership possessed characteristics that Green Street usually considers as reasons to discount a firm's value from NAV.[41]

Finally, Markman's testimony is less persuasive than that of Gotham's original expert, Stanger, who was more familiar with real estate limited partnerships. Stanger's data showed that units in real estate limited partnerships often change hands at steep discounts to NAV.

For all these reasons, I find Gotham's advocacy of a 100% NAV value unconvincing. Having so concluded, I now explain more briefly why I reject Rosenbloom's 60% discount.

Rosenbloom derived his discount primarily by looking at discounts for non-distributing limited partnerships and at two of his comparable companies, Catellus and National. The non-distributing limited partnerships traded at a median discount of 64% to NAV. Catellus and National traded at an average discount of 67%. Rosenbloom used this data to conclude that the Partnership should trade at a discount of 60% to NAV.

My judgment is that this discount is too great given the Partnership's listing on a major exchange and its improving performance. Given all the subjective data points in the case, I find the most proba-

---

**38.** Markman's testimony that investors do not care if firms distribute cash is a generalization from finance theory as a whole. It belies the market evidence regarding real estate investments, which indicate that distributions affect pricing. Green Street's own publication indicates that REIT earnings yields track bond yields. The record evidence as a whole suggests that investors in real estate entities care about current yield and that a non-distributing Partnership will be valued at a steeper discount to NAV than a distributing REIT.

**39.** Tr. I at 300–14.

**40.** *Id.*

**41.** Gotham wanted me to value the Partnership as if it converted to a REIT with internal management, saying that the Audit Committee should have considered these methods of reducing the disparity between the Partnership's NAV on paper and the trading price of its units. This is a counter-factual I do not consider; I am valuing the Partnership as it actually existed as of the Odd Lot Resales.

tive (if still imperfect) data to be the list of tender offers compiled by Stanger—and presented to me by Gotham as reliable. I therefore adopt the discount implied by the Stanger Report of 36%, which yields a value of $38.86 per unit. This is a premium of 174% over the market price HGI paid in the Odd Lot Resales.

### D. The Market Value of the Partnership's Units

■■■ Whether or not the Partnership's units were thinly traded, they were listed on a major exchange. The Partnership published regular financial disclosures that enabled interested investors—such as Gotham—to easily calculate an NAV for the firm. In the real world, market prices matter and are usually considered the best evidence of value.[42] And they should matter in formulating a remedy in this case.[43]

According to Gotham's presentation at the remand hearing, a potential acquiror faced no substantial barrier to winning a proxy contest at the Partnership in July 1995. As a result, any potential acquiror—under Gotham's view—had a huge opportunity then because the company was trading at such a steep discount to NAV.

When the Odd Lot Offer was announced, any such acquiror could have made a topping move and attempted to acquire control of the Partnership for itself. Gotham itself recognized the discount and bought units, but then came to believe that another opportunity to be part of a credit facility was a better investment. Moreover,

during this period, large real estate investors were in the market, making bids. Although I conclude that it would have been very difficult to dislodge the General Partner via a proxy contest before the Odd Lot Resales, it was not impossible. And, given the supposed value that an acquiror could have reaped, hungry buyers like Carl Icahn would not have been deterred had they found the Partnership as attractive as Gotham now claims it was. Indeed, Icahn is now making a play for the Partnership, irrespective of the outcome of this litigation.

All of this suggests that the paper-driven valuations that most occupy this opinion and the remand proceedings slight the real world risk factors that reasonable investors consider important. These include the imprecision of appraised values and the fact that small errors in valuation can cause entities heavily reliant on debt to face a serious risk of default. They also include the nature of the Partnership's real estate assets, which were second-tier in nature, and the uncertainty over whether the then-developing recovery in the real estate markets would continue. I note in both regards that the Partnership's appraisals had not always panned out in the past, as evidenced by the fact that it had deeded several properties in lieu of foreclosure.

Market price is relevant for another reason. Because HGI had the right to make market purchases so long as it complied

---

**42.** A respected valuation primer suggests that there is "no reliable evidence supporting the view that the valuation errors on the part of the market can be identified by an alternative appraisal procedure." Bradford Cornell, *Corporate Valuation* 55. By giving market price some weight, I give it less weight than is probably warranted. I do so in the spirit of the remand and in order to give the benefit of the doubt to the Partnership, as the party

injured by violation of the Partnership Agreement.

**43.** *Application of Del. Racing Ass'n,* 213 A.2d 203, 211 (Del.1965) ("It is, of course, axiomatic that if there is an established market for shares of a corporation the market value of such shares must be taken into consideration in an appraisal of their intrinsic value."), *quoted in Technicolor,* 1990 WL 161084, at *30–*31.

with the securities laws, it had little reason to pay a huge premium to market in the Odd Lot Resales. As Gotham's own purchases show, the acquisition of large amounts of Partnership units could have been had over a commercially reasonable timeframe for prices far below that identified in the DCF, comparable companies, and the NAV estimates I have settled upon. Likewise, it seems obvious that HGI could have made a non-coercive tender offer with full disclosure at a price at or below the original damage award and swept in more units than were acquired in the Odd Lot Resales.

### E. *The Addition of an Additional Premium to Reach a Final Damages Figure*

 Giving these factors equal weight, I reach a value for a unit of the Partnership of $31.06.[44] That figure is already 119% above the market price paid in the Odd Lot Resales. It therefore reflects a price far above what any third party would ever have paid to the Partnership for the Odd Lots in July 1995. It also reflects a price much higher than HGI would have paid if it had been asked.

Nonetheless, the Remand Order must, I think, be read as requiring me to add an additional "control premium" to this amount.[45] That is, in a sense, odd because control premiums are usually pegged to market prices. It is therefore typical, for example, to find a merger for control occurring at a "premium" to the pre-announcement market price but within DCF and comparable companies fairness ranges. Such deals are still considered ones involving a control premium.

Here, however, I believe the spirit of Remand Order requires me to add a control premium on top of the values I have calculated, even though the value I calculated is already 119% over market. Gotham contends that the way to do that is for me to accept its estimate of the full value of control over the Partnership, as estimated in its analysis [46] of estimated cash flows to the General Partner. For their part, the defendants refer me to transactions involving changes of control in real estate entities during a period relevant to the Odd Lot Resales.

I believe that the defendants' approach is the more sound one. In so finding, I begin with an understanding far different than Gotham's, which is that HGI already had a large degree of control over the Partnership. That control included a sufficient amount of voting power to make the attainment of a two-thirds majority for the

---

**44.** ($36.16 + $35.00 + $38.86 + $14.20) ÷ 4 = $31.06

**45.** Some of the valuation analyses I have undertaken can be seen as generating a (hypothetical) value for a marketable minority unit (*e.g.*, the comparable companies analysis). But, in my view, the idea that the minority value of a unit was 119% above market for a listed security whose issuer filed regular financial disclosures is an artifact of this litigation context rather than a financial reality. Like the defendants, I construe the mandate as an order that I adjust the base valuation (an estimate itself) to add another amount (an estimate) to reach a final award. If free to do so, I would award the base award only, as a more realistic and fitting remedy. If I have misconstrued the mandate, the Supreme Court is, of course, free to deduct the additional premium.

As a note of caution, I also wish to emphasize the unusual posture of this case. The facts are not typical of valuation cases in this court (*e.g.*, appraisals) and the mandated analysis's generation of an award so out of line with the market should not be read as trend-setting in any manner. The award may not only be described as generous, it may also aptly be described as *sui generis*.

**46.** As noted, *see supra* note 26, that analysis depends on an aggressive multiple of earnings.

General Partner's removal extremely difficult. Notably, this control also included the ability to wield the Partnership's rights plan and the ability to determine whether new unitholders would have voting rights. Reflecting the reality that the General Partner occupied a position of relative security over management of a public company, HGI had paid a large sum when it first acquired the General Partner interest from Equitec.

Gotham ignores these attributes of control and acts as if HGI had no hold on control whatsoever as of July 1995. In doing that, it ignores reasonable testimony from Alan Miller, the defendants' proxy expert, as well as the report prepared by its own proxy expert for the first trial, Edward McCarthy, who never testified. Although Gotham makes challenges to the edges of Miller's testimony, I need not—and do not—rely on the edges of that testimony.[47] What I do rely upon is the considerable force of Miller's testimony that removal of the General Partner would have been extremely difficult even before the Odd Lot Resales.[48] Gotham's own challenge to Miller's testimony underscores the difficulty of such an endeavor.[49]

Because the General Partner already had a strong control position, the court found in the Post–Trial Opinion that the Odd Lot Resales had the effect of solidifying the General Partner's hold on control, changing the probability of its likely removal through a proxy fight from small to virtually nil. The Supreme Court adopted the same approach, and nothing in its decision requires me to ignore the pre-existing level of control held by the General Partner when calculating an appropriate control premium.

For this reason, I believe that Rosenbloom's approach of adding a per unit premium to the damages award that reflects the premiums paid in acquisitions of control of real estate companies in a time frame relevant to the Odd Lot Resales is reasonable. I also conclude that Rosenbloom used a reasonable methodology in determining the universe of pertinent transactions. His list of guideline transactions involved the payment of a 16% median premium.[50] Notably, that median represented the premium paid over market price, not over a hypothetically calculated "fair value." The premium to market comparison is the standard way premiums are calculated.

I find that the responsible way to account for a control premium is to add 16% to the "value" resulting from the previous analysis. This addition is sufficient to account for the additional control gained by the General Partner recognizing that: (1) the General Partner already had a strong grip on control before the Odd Lot Resales; (2) the premium is added not to the market price, but to a hypothetically determined value that already represents a

---

**47.** In other words, I do not find (as Miller testified) that the chances of removing the General Partner before the Odd Lot Resales was merely 1%. I simply conclude that it would have been extremely difficult to muster a two-thirds majority given HGI's holdings and the holdings of General Partnership officers.

**48.** This conclusion rests on HGI's and management's pre-existing holdings, the Two–Thirds Removal Provision, the defensive powers available to the General Partner under the

Partnership Agreement, and the composition of the Partnership's unitholder base, which was thin on high-voting institutional investors and thick in classes (*e.g.,* retail holders) with lower voting rates.

**49.** *See* Pl.'s Opening Br. Ex. A.

**50.** This was higher than the premiums on control transactions in data complied by Markman, which showed a median premium of 10% over market.

119% premium to market; (3) the General Partner had other lower-cost options to increase its unit ownership; (4) a tender offer at the original damage award level of $25.84 would likely have swept in far more than 293,539 units; and (5) the failure of any other purchasers to come forward and make an offer for the Partnership, despite the fact that Gotham has argued that the market for acquisitions of real estate entities was active in 1995.

 The total damages award I fashion is tied to a value of $36.02 per unit and thus represents a 154% premium over the market price of $14.20 per unit paid by HGI in the Odd Lot Resales.[51] Gotham has failed to present evidence that transactions at this level occur in the real world.

### VII. Should the Court Sterilize HGI's Voting Rights?

 Gotham continues to argue for a sterilization of the voting rights of the units HGI acquired in the Odd Lot Resales. It contends that a rational way to do this would be to require that HGI's units be voted in proportion to the votes of other unitholders.

I do not adopt this proposed remedy because I believe that too much time has passed for it to be equitable to strip HGI of its right to vote the units. Although that remedy would not be as extreme as rescission, it leaves HGI and the General Partner compromised in relation to where they would have been had Gotham timely asserted its claims. That is, had there been a more timely assertion of these claims, HGI could have bought shares in the market over a commercially reasonable period at price levels akin to what Gotham itself paid. If HGI was forced to replace its voting power now, it would do so at far greater cost, in a market inflated by the takeover fight that is now ongoing.

If, however, a reviewing court were to disagree and conclude that such an injunctive award should be imposed, it would be best imposed in the following fashion. First, if HGI is to lose its voting rights, it should not be required to pay any damages award. If HGI was simply acting as a back-up purchaser of the Odd Lots and received non-voting units, it is improbable that it would have paid any premium to market at all. The reason for doing so is not at all apparent given Gotham's ability to pick up substantial units in the market at levels far less than the original damage award.

Second, if HGI's units were to be required to vote in proportion to the other unitholders, those unitholders should be the unitholders other than High River. If the objective is to remedy the harm to public unitholders from the entrenchment effect of the Odd Lot Resales, then High River's voting power in a proxy fight should not be artificially inflated by any remedial order of this court. So long as the former Gotham bloc now held by High River is retained as a single bloc that is capable of being utilized as a lever in a takeover bid, any requirement that HGI's shares be voted in proportion to other votes should exclude that bloc. That proviso would ensure that the public unitholders would determine how the units HGI acquired in the Odd Lot Resales will be voted.

Of course, Gotham may argue that the fair award is to substitute a restriction on voting for (what it will argue is the excessively modest) 16% additional premium that I have awarded. That argument

---

**51.** If the Supreme Court believes that the market price should be given no weight at all (which I do not), the award would be tied to $42.54 per unit or a 200% premium. ($36.16 + $35.00 + 38.86) ÷ 3 × 1.16 = $42.54.

would be unconvincing. It would be ridiculous to conclude that any rational party similarly situated to HGI in the summer of 1995 would have paid $31.06—or a 119% premium over market—for 293,539 units that would have no independent voting rights.[52] For that reason, if an alternative remedy in equity is imposed it should be comprised entirely of a restriction on voting with no separate monetary component.

## VIII. *Conclusion*

For the reasons I have articulated, I impose a monetary damage award of $21.82 ($36.02—$14.20) per unit plus prejudgment interest calculated in accordance with the original post-trial decision. Recognizing that the Supreme Court might have different views about the appropriate remedy, I have attempted to craft an opinion that gives the Supreme Court the option to impose its own alternative remedy and final order immediately.

The parties shall collaborate and submit a form of final order within ten days of the date of this opinion. That collaboration shall include a face-to-face conferral on the appropriate award of attorneys' fees for Gotham and consideration of whether the parties can agree on an award tied to a percentage of the damages I have awarded.

---

52. Note that voting rights would have been relevant to any minority purchaser. The right to vote on the removal of the General Partner and whether to liquidate are examples of the utility of the franchise. Gotham would never have purchased non-voting units even *at the market prices* it paid.