# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TOPTAL, LLC | ) | |
| | ) | C.A. No.: N25C-01-266 FJJ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| BLOOMBERG L.P. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: July 15, 2025
Decided: July 31, 2025

## OPINION AND ORDER
*On Defendant's Motion to Dismiss*

### GRANTED, in part, and DENIED, in part.

*Brian E. Farnan* and *Michael J. Farnan*, Esquires, Farnan LLP, Wilmington Delaware, *Megan L. Meier, Mark R. Thomson,* and *Devin K. Bolger*, Esquires (Pro Hac Vice) Meier Watkins Phillips Pusch LLP, Washington, D.C., *Alan S. Lewis* and *Madelyn K. White*, Esquires (Pro Hac Vice) Carter Ledy & Milburn LLP, New York, New York, *Attorneys for Plaintiff.*


*James M. Yoch, Jr.* and *Skyler A. C. Speed*, Esquires, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, *Thomas G. Henoff, Nicholas G. Gamse,* and *Alexandra M. Gutierrez*, Esquires (Pro Hac Vice), Williams & Connolly LLP, Washington, D.C., *Attorneys for Defendant.*



**Jones, J.**

## INTRODUCTION

Plaintiff Toptal, LLC ("Toptal") brings the instant defamation action from an article and column (collectively, the "Publications") published by Defendant Bloomberg L.P. ("Bloomberg). The Publications cover a prior litigation in Nevada State Court initiated by Toptal against a former financial supporter of the company whom the Nevada Court found liable for multiple claims. Toptal asserts *inter alia* Bloomberg's publications do not accurately or fairly report on the Nevada litigation and make numerous false and defamatory statements impacting Toptal's integrity as a respected company.

## BACKGROUND

### A. The Parties

Toptal is a Delaware limited liability company which connects "businesses with freelancers such as software engineers, designers, and business consultants."[1] Toptal's sole member, Taso Du Val, founded the company in 2010.[2] The company does not have a physical office space, but it uses its Delaware address for purposes such as issuing employee W-2s and on contracts with clients and vendors.[3]

Bloomberg is a Delaware limited partnership and has its principal place of business in New York.[4] Bloomberg News is a news agency headquartered in New

---

[1] Docket Item ("D.I.") 1 ¶¶3, 17.
[2] *Id.*
[3] *Id.*; D.I. 17 p.9.
[4] D.I. 1 ¶19.

2

York and is a division of Bloomberg.[5] Bloomberg News "disseminates articles around the world through its website," and other publication means.[6]

**B. The Nevada Litigation[7]**

The Publications write on a legal dispute between Toptal and one of its early financial supporters, Denis Grosz ("Grosz").[8] In 2012, Grosz gave Toptal $1 million under a Note Purchase Agreement and a Convertible Promissory Note (collectively, "Convertible Note Agreements") which allowed Grosz to convert his debt into equity under certain conditions.[9] Grosz had an electable option to forego principal and interest and instead receive equity on his note.[10] If the conditions were not met when the note's maturity date approached, Grosz was only permitted to receive principal and interest, and his note could not convert into equity.[11] Under an Advisor Agreement, Grosz acted as an advisor to Toptal and agreed to not compete with the company and to keep all company information confidential.[12] The conditions triggering Grosz's note to convert into equity were never met, thus, under the agreement, Grosz was entitled to receive only principal plus interest.[13]

---

[5] *Id.*
[6] *Id.*
[7] *See Toptal, LLC v. Grosz*, CV20-00555 (Nev. 2d Dist.); D.I. 1 Exhibits (Exs.) 1-3.
[8] D.I. 1 ¶3.
[9] D.I. 17 p.2; D.I. 1 ¶36.
[10] D.I. 1 ¶37.
[11] *Id.* ¶40.
[12] *Id.* ¶41.
[13] D.I. 17 p.2-3.

Grosz and Toptal's relationship became strained when, as Toptal alleges, Grosz "embarked on a malicious plot" to "weaken" Toptal.[14] Toptal alleges Grosz's plan included "a negative media campaign against Toptal" as well as a ploy "to steal Toptal's future business and financial prospects for himself" by forming a competing company, Mechanism Ventures ("Mechanism").[15]

As a result, in March 2020, Toptal initiated the Nevada litigation raising tort and contractual claims against Grosz and Mechanism.[16] Grosz brought a counterclaim stating Toptal breached the Convertible Note Agreements by failing to give Grosz equity.[17] The Court dismissed the counterclaim on summary judgment.[18]

At trial, a jury: (1) rejected Grosz's other counterclaims, including Toptal's breach of implied covenant of good faith and fair dealing; (2) found Grosz breached the Advisor Agreement and the implied covenant of good faith and fair dealing; (3) found Mechanism liable for intentional interference with contractual relationships; and (4) awarded Toptal over $1.3 million in compensatory damages and $15 million in punitive damages, stating that Mechanism acted with "malice, oppression, or fraud."[19] The trial judge affirmed the verdict but reduced the punitive damages

---

[14] *Id.* p.3.
[15] D.I. 1 ¶¶ 46, 47.
[16] D.I. 13 p.6.
[17] D.I. 17 p.3.
[18] *Id.*
[19] D.I. 13 p.4.

award to $1.6 million.[20]   Both Grosz and Mechanism appealed the Court's judgements against them.  The appeals are currently pending.[21]

## C. The Publications

After the Nevada Court entered its judgment, Bloomberg published reporter Sarah McBride's Article entitled *Battle Over Startup Leaves Early Investor With No Equity, $2.6 Million Legal Bill* (the "Article") and columnist Matt Levine's Column titled *The FTC Comes for Noncompetes* (the "Column") which includes Levine's commentary and an excerpt from the Article.[22]   The Article reports on Toptal's practice of using convertible notes to allow lenders to potentially convert their note into equity, this practice playing out between Toptal and Grosz, and the Nevada litigation between Toptal and Grosz and his company, Mechanism.[23]

Toptal contacted Bloomberg after publication, seeking revisions of statements Toptal claimed were false.  The alleged false reports included:

> (1) Grosz's "investment" – as opposed to his now proven misconduct – "landed him on the receiving end of a lawsuit;" (2) "Grosz didn't get his stake" in Toptal; (3) Toptal "denied early investors a return by refusing to switch their decade-old convertible debt commitments into equity, tying up their holdings even as the company has flourished . . . making their outlay worth little more than the day they invested;" and (4) "Grosz could still see an equity conversion," even though the court had held the opposite.

---

[20] *Id.*
[21] D.I. 1 ¶76.
[22] D.I. 13 p.5; D.I. 17 p.9.
[23] *See* D.I. 1 Ex. 4, the Article.

In response, Bloomberg changed the title of the Article to *A $1 Million Bet on a Tech Startup Spawns Investor-Founder Fight* and made several revisions concerning Toptal's equity and Grosz's post-litigation chances of an equity conversion ("the Revision").[24]

Toptal alleges the Publications hurt Toptal's reputation and prevented prospective employees and business partners from working with Toptal.[25] Toptal points to two specific instances. The first situation involves an email sent from "a leading candidate for a key senior role at Toptal" to Toptal's head of recruiting. The email included the candidate's application withdrawal and a link to the Publications indicating the Publications were the reason for pulling themselves out of consideration for the position.[26] The second circumstance involved a potential business partner referencing the Revised Article as the basis for not working with Toptal.[27] Toptal further alleges that "others in the business community" have told Du Val that the Article "has been mentioned as a source of grave concern that reflects negatively on Toptal and dissuades them from wanting to enter into business deals with Toptal."[28]

---

[24] *See* D.I. 13 Ex. 7.
[25] D.I. 17 p.6-7.
[26] *Id.* p.6 (citing D.I. 1 ¶109).
[27] D.I. 17 p.6 (citing D.I. 1 ¶129).
[28] D.I. 1 ¶131.

## STANDARD OF REVIEW

Rule 12(b)(6) allows the Court to dismiss for failure to state a claim upon which relief can be granted.[29] While ruling on a motion to dismiss, the Court:

> (1) accept[s] all well pleaded factual allegations as true, (2) accept[s] even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) do not affirm a dismissal unless the plaintiff would not be entitled to recover under any reasonable conceivable set of circumstances.[30]

Delaware is a notice pleading jurisdiction.[31] Therefore, for a complaint to pass the motion to dismiss stage it needs to provide only "general notice of the claim asserted."[32] "An allegation, 'though vague or lacking in detail' can still be well-pleaded so long as it puts the opposing party on notice of the claim brought against it."[33]

## ANALYSIS

### A. Choice of Law

The parties dispute the law applicable to this matter. Defendant claims New York law applies. Plaintiff counters that Delaware law is applicable.

*1. An Actual Conflict Exists Between New York and Delaware Defamation Laws.*

---

[29] Super. Ct. Civ. R. 12(b)(6).
[30] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings*, 27 A.3d 531, 535 (Del. 2011).
[31] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).
[32] *Id.* (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).
[33] *Cahill*, 884 A.2d at 458 (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003)).

The parties dispute the law applicable to this matter. Bloomberg claims New York law applies. Toptal counters that Delaware law is applicable. [34]

The preliminary query when conducting a choice of law analysis under Delaware law is a comparison of Delaware law and "the laws of the competing jurisdiction to determine whether the laws actually conflict on a relevant point."[35] A genuine conflict does not exist if "application of the competing laws would yield the same result."[36] In that instance, the Court does not need to conduct a choice of law analysis.[37]

The Court finds there are genuine conflicts between New York and Delaware's defamation laws. First, New York's fair-report privilege is codified, and Delaware only recognizes the privilege in case law.[38] Second, New York has codified anti-SLAPP fee-shifting protections for publishers.[39] Third, New York law requires a showing of special damages when the challenged statements are not defamatory *per se*.[40] Whereas, under Delaware law, there is no such requirement to plead special

---

[34] *See* D.I. 13 p.17; D.I. 17 p.7-8.
[35] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773-74 (Del. Ch. 2014).
[36] *Id.* at 774.
[37] *Id.*
[38] *See* N.Y. Civ. Rights Law § 74; *see also US Dominion v. Newsmax Media, Inc.*, 2025 WL 211497, at *4 (Del. Super. Ct. Jan. 16, 2025) (finding an actual conflict between New York and Colorado's fair report privilege based on codification).
[39] *See* N.Y. Civ. Rights Law § 70-a.
[40] *Pantheon Props, Inc. v. Houston*, 2021 WL 4523619, at *3 (S.D.N.Y. Sept. 30, 2021).

damages.[41]  Finally, New York defamation case law, compared to Delaware case law, is more developed and provides broader protections.[42]

> 2. *Delaware Has the Most Significant Relationship to the Occurrence and the Parties; Therefore, the Court Applies Delaware Law.*

Since an actual conflict exists, the Court proceeds to the "most significant relationship test" as defined by the Restatement (Second) of Conflicts.[43]  Looking to the Restatement, Section 150 applies the following to multistate defamation cases:

> (1) The rights and liabilities that arise from defamatory matter in any one…aggregate communication are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> ***
>
> (3) When a corporation…claims that it has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the corporation…had its principal place of business at the time, if the matter complained of was published in that state.[44]

An "aggregate communication" is one that is "published simultaneously in two or more states," including a "typical Internet publication, where access is generally available to anyone at any time."[45]

---

[41] *Cahill*, 884 A.2d at 463 (citing *Spence v. Funk*, 396 A.2d 967, 970-71 (Del. 1978)).

[42] *See e.g.*, Delaware case law has not uniformly adopted a defamation by implication standard, whereas New York has a stringent-well-established standard, *Rappaport v. VV Publ'g Corp.*, 618 N.Y.S.2d 746, 748 (Sup. 1994); *Henry v. Fox News Network LLC*, 629 F.Supp.3d 136, 150 (S.D.N.Y. 2022).

[43] Delaware adopts and follows the Restatement (Second) of Conflicts in a choice of law analysis. *See Smith v. Del. State Univ.*, 47 A.3d 472, 480 (Del. 2012).

[44] Restatement (Second) of Conflict of Laws § 150 (1971).

[45] *Aoki v. Benihana, Inc.*, 839 F.Supp.2d 759, 765 (D. Del. 2012).

9

Bloomberg argues New York has the most significant relationship to this case because of both parties' contacts with New York.[46] Bloomberg bases this on Toptal's lack of physical headquarters and its sole member being a resident of New York.[47] Bloomberg also points out that in a federal court proceeding, Toptal represented that "Toptal's single member, Mr. Du Val, is a resident of New York, *and therefore Toptal itself is located in and was injured in New York.*"[48] Bloomberg further supports its argument with the fact that Bloomberg's news headquarters and principal place of business are both in New York.[49]

Toptal contends Delaware has the most significant relationship. To support this position, Toptal points to its stronger ties to Delaware than New York including (1) forming in Delaware; (2) using its Delaware address in employee W-2s and contracts with clients and vendors; (3) emphasizing it is a Delaware business in contracts; and (4) deriving its largest portion of revenue from clients who are Delaware entities. [50]

In the pleadings, Toptal does not claim a principal place of business. Toptal asserts it is a "fully remote company with no physical offices or headquarters, and its operations are dispersed all over the world," and "its personnel typically working

[46] D.I. 13 p.17.
[47] *Id.*
[48] *Id.* (citing Ex. 8). Bloomberg cited this quotation from Toptal's opposition brief in a federal court case based on a trade secret violation claim. *Id.* Ex. 8 p.1-3. Toptal made the statement in relation to a personal jurisdiction analysis under New York law. *Id.* Ex. 8 p.16-17. The Court does not find this helpful or persuasive to this Delaware choice of law analysis.
[49] D.I. 13 p.17.
[50] D.I. 17 p.9-10.

from their own workspaces."[51]  However, Toptal maintains, based on the above facts, "to the extent § 150 points toward any state's law, it's Delaware's."[52] Considering Toptal's contacts with Delaware and its lack of physical office space and central operations location, the Court will refer to Delaware as Toptal's principal place of business for purposes of this analysis.

In its Reply Brief, Bloomberg cites to case law outside of Delaware courts to argue that in situations such as this one where the company is fully-remote, the location of "key decision-making executives" is the principal place of business.[53] However, Toptal does not allege that Du Val, in his capacity as Toptal's CEO, primarily conducts work nor makes decisions for Toptal in New York.  The Complaint only alleges that Du Val is a resident of the State of New York.[54]

Comment f to Restatement Section 150 states, "the local law of the state of plaintiff's principal place of business will [] usually be applied, even though some or all of the defamer's acts of communication were done in another state, if all of the plaintiff's business is carried on in the former state."[55]  This is also the case when the defamatory acts occur in "a state other than that of plaintiff's principal place of business and when the matter complained of is published in the state of the plaintiff's

---

[51] *Id.* p.10; D.I. 1 ¶17.
[52] D.I. 17 p.10.
[53] *See* D.I. 24 p.6 (citing *Paucek v. Shaulis*, 2025 WL 1298457, at *18 (D.N.J. May 6, 2025); *Benchmark Invs., Inc. v. PAVmed Inc.*, 2021 WL 5967918, at *3 (S.D.N.Y. Dec. 16, 2021)).
[54] D.I. 1 ¶ 18.
[55] Restatement (Second) of Conflict of Laws § 150 cmt. f.

11

principal place of business and in one or more other states to which the plaintiff has a substantial relationship."[56] Comment b provides the purpose for the Restatement's lean towards applying the law of the plaintiff's principal place of business is to "further[] the choice of law values of certainty, predictability and uniformity of result and of ease in the determination and application of the applicable law."[57]

Restatement Section 150 maintains the presumption that "the law of the state where a plaintiff's principal place of business applies unless there are significantly sufficient considerations warranting the application of the law of a different state."[58] Other considerations the Court should take into account when determining the state with the most significant relationship in a multistate defamation include "the state or states where the defendant did his act or acts of communication, such as assembling, printing and distributing a magazine or book, [] the state or states of the defendant's…organization and principal place of business," and "the state where the defamatory communication caused plaintiff the greatest injury to its reputation."[59] This last consideration is most applicable where:

> (a) the plaintiff is better known in this state than in the state of its principal place of business, as might be the case if the plaintiff does approximately the same amount of business in this state as it does in the state of its principal business and this state is the state of the plaintiff's incorporation or organization, or (b) the matter claimed to be defamatory related to an activity of the plaintiff that is principally

---

[56] *Id.*
[57] *Id.* cmt. b.
[58] *US Dominion, Inc.*, 2025 WL 211497, at *5.
[59] *Id.*

located in this state, or (c) the plaintiff suffered greater special damages in this state than in the state of its principal place of business, or (d) the place of principal circulation of the matter claimed to be defamatory was in this state.[60]

Each of these factors must be considered "in the light of the choice of law principles stated in § 6."[61]

Analyzing these considerations, the Court does not find them to be sufficiently significant to warrant applying New York law over the presumed Delaware law. First, there is not one state of publication or alleged defamatory act that is more prominent than others. While Bloomberg News is headquartered in New York, the reporter on the Article was domiciled in California, the litigation the Publications covered took place in Nevada, and the Publications were posted to Bloomberg.com which is accessible worldwide. The next consideration, the states of Defendant's organization and principal place of business, does not add weight to either side of the argument because Bloomberg has its principal place of business in New York and is an entity of Delaware. Finally, the Court does not find any considerations under state of greatest injury to favor either New York or Delaware. Toptal does not

---

[60] *Id.*

[61] Restatement (Second) of Conflicts of Law § 150 cmt. b. The principles laid out in § 6 include:

    (a)  the needs of the interstate and international systems,

    (b)  the relevant policies of the forum,

    (c)  the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d)  the protection of justified expectations,

    (e)  the basic policies underlying the particular field of law,

    (f)  certainty, predictability and uniformity of result, and

    (g)  ease in the determination and application of the law to be applied.

assert that any alleged harm or injury was felt in a specific state. Bloomberg's argument that Toptal has the most significant relationship to New York because Du Val is a New York resident does not tip the scale in this analysis. Toptal does not assert that Du Val's residence is where the majority of Toptal's contacts are nor where a significant portion of the company's work is done.

Delaware case law concerning alleged defamation on internet platforms further supports the application of Delaware law in this case.[62] Moreover, the Delaware Superior Court has held that both parties being Delaware entities is a consideration which supports applying Delaware law.[63]

Therefore, the Court finds based on the presumption set forth in Restatement § 150, cited case law, and Bloomberg's inability to assert a significantly sufficient consideration deeming New York law more appropriate, that Delaware law applies as it is the state with the most significant relationship to the instant action.[64]

**B. Substantially False or Defamatory Statements**

---

[62] *See e.g. U.S. Dominion, Inc.*, 2025 WL 211497 (finding plaintiff's principal place of business to outweigh other Restatement considerations in choice of law analysis); *Armenta v. G/O Media Inc.*, 2024 WL 4433946, at *5 (Del. Super. Oct. 7, 2024) (applying the law of plaintiff's domicile because no other jurisdiction had a significant relationship to the case); *Schmidt v. Washington Newspaper Publ'g Co., LLC*, 2019 WL 4785560 at *2 (Del. Super. Sept. 30, 2019) ("When choosing the applicable law for a claim arising from an Internet publication, the state with the most significant relationship will usually be the state where the person is domiciled at the time of publication.").

[63] *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *19 (Del. Super. June 24, 2021) ("Having been formed in Delaware under Delaware law, the Court finds it reasonable to assume that each party has endeavored to 'mold[] [its] conduct to conform to the requirements of' Delaware law.")

[64] The Court bases its decision on the present record. If discovery reveals facts that suggest New York should be applied, the parties are free to bring the issue back to the Court.

To properly allege defamation, a plaintiff must plead: "(1) a false and defamatory communication concerning the plaintiff, (2) publication of the communication to third parties, (3) understanding of the defamatory nature of the communication by the third party, (4) fault on the part of the publisher, and (5) injury to the plaintiff."[65] When the plaintiff is a public figure, the plaintiff must also allege that (6) the statements are false and (7) the defendant made the statement with "actual malice."[66] Statements are defamatory *per se* if they "malign one in a trade, business, or profession" or "impute a crime."[67] Proof of special damages is not required for a libel plaintiff to recover.[68]

The Restatement (Second) of Torts, adopted by the Delaware Courts,[69] defines defamation as "[a] communication…tend[ing] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."[70] "Whether a statement is capable of bearing a particular meaning, and whether that meaning is defamatory, is a question for the court."[71] However, "only if the Court determines, in the first instance, that the words

---

[65] *Images Hair Sols. Med. Ctr. v. Fox News Network, LLC*, 2013 WL 6917138, at *3 (Del. Super. Dec. 20, 2013)(quoting *Bickling v. Kent Gen. Hosp., Inc.*, 872 F.Supp.1299, 1307 (D. Del. 1994)).

[66] *ShotSpotter Inc. v. VICE Media, LLC*, 2022 WL 2373418. *See* D.I. 1 ¶¶ 127, 145 Toptal pleads that Bloomberg acted with actual malice, or at least reckless disregard, in publishing false and defamatory statements.

[67] *Feldman v. Marks*, 2024 WL 4263931, at *6 (Del. Super. Sept. 23, 2024) (quoting *Spence*, 396 A.2d at 970)).

[68] *Cahill*, 884 A.2d at 463 (quoting *Spence*, 396 A.2d at 970).

[69] *See Q-Tone Broad., Co. v. Musicradio of Maryland, Inc.*, 1994 WL 555391, at *4 (Del. Super. Aug, 22, 1994); *Spence*, 296 A.2d at 969.

[70] Restatement (Second) of Torts § 559 (1977).

[71] *Id.* The question of "whether or not a statement is defamatory is a question of law." *Cahill*, 884 A.2d at 463.

15

are capable of a defamatory meaning may a jury consider whether such meaning is ascribed to the words."[72]

When considering whether a challenged statement is defamatory, the Court asks (1) "whether alleged defamatory statements are expressions of fact or protected expressions of opinion;" and (2) "whether the challenged statements are capable of a defamatory meaning."[73]

Opinion statements are protected by the First Amendment and, therefore, are not actionable under a defamation claim.[74] A "pure opinion" is predicated on stated or known facts or facts the parties assume exist.[75] "Opinions based on nondefamatory facts do not give rise to an action for libel."[76] Delaware Courts adopted a four-part test to determine whether a statement is a fact or an opinion.[77] The test includes determining (1) "common usage or meaning of the challenged language;" (2) "whether the statement can be objectively verified as true or false;" (3) "the full context of the statement;" and (4) "the broader social context into which the statement fits."[78]

---

[72] *Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987) (quoting *Slawik v. News-Journal Co.*, 428 A.2d 15, 17 (Del. 1981)).
[73] *Cahill*, 884 A.2d at 463 (quoting Riley, 529 A.2d at 251).
[74] Riley, 529 A.2d at 251.
[75] *Id.*
[76] *Id.* at 250 (citing Restatement (Second) of Torts, §566).
[77] *Riley*, A.2d at 251.
[78] *Id.* (citing *Ollman v. Evans*, 750 F.2d 970, 979-85 (D.D.C. 1984)).

Delaware Courts also adopted New Jersey's three-part test to conclude whether a statement is capable of defamatory meaning.[79] This test examines the (1) content; (2) verifiability; and (3) context of an alleged defamatory statement.[80]

First looking to content of the alleged defamatory statements, "the Court must look to the 'fair and natural meaning which will be given it by reasonable persons of ordinary intelligence.'"[81] A party cannot be held liable for defamation if the statement made is "substantially true."[82] The content of an alleged defamatory statement is "substantially true" if the statements were "no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been."[83] An important consideration when determining whether a statement is "substantially true" is whether the "gist" or "sting" of the article is true, meaning "it produces the same effect on the mind of the recipient which the precise truth would have produced."[84]

Second, evaluating verifiability of the alleged defamatory statements ensures "dispos[al] of defamation claims arising from the expression of mere opinions."[85]

---

[79] *See Q-Tone Broad., Co.*, 1994 WL 555391, at *4.
[80] *Images Hair Sols. Med. Ctr.*, 2013 WL 6917138, at *3.
[81] *Id.* (quoting *Q-Tone Broad., Co.*, 1994 WL 555391, at *5)).
[82] *Riley*, 529 A.2d at 253 (citing *Gannett Co., Inc. v. Re*, 496 A.2d 553, 557 (Del. 1985)).
[83] *Images Hair Sols. Med. Ctr.*, 2013 WL 6917138, at *3 (quoting Riley, 529 A.2d at 253).
[84] *Riley*, 529 A.2d at 254 (quoting *Williams v. WCAU-TV*, 555 F.Supp. 198, 202 (E.D. Pa. 1983)).
[85] *Images Hair Sols. Med. Ctr.*, 2013 WL 6917138, at *3.

"[U]nless a statement explicitly or implicitly rests on false facts that damage a person's reputation, the statement will not be actionable as defamation."[86]

Finally, the Court must consider the context in which the statements were made. "The listener's reasonable interpretation of the statement will be based, in part, on the context in which the speaker made the statement."[87] The Court should evaluate the statement "based on the words and the context in which they were published."[88]

The parties' dispute centers around the first element of defamation and concerns whether certain statements within the Publications are false and defamatory. The Court will go through each purported defamatory statement below. The Article and the Column will be analyzed separately.

## The Article

1. *Statements Concerning Grosz's Relationship with Toptal and the Motivator of the Nevada Litigation*

The first statement Toptal alleges is false and defamatory from the Article is "[w]hen Denis Grosz invested in software startup Toptal LLC in 2012, he hoped the $1 million bet could one day make him a fortune. Instead, it landed him on the receiving end of a lawsuit…"[89] Toptal asserts this statement provides two false and

---

[86] *Q-Tune Broad. Co.*, 1994 WL 555391, at *5.
[87] *Id.*
[88] *Cahill*, 884 A.2d at 463 (quoting Riley, 529 A.2d at 251).
[89] D.I. 13 Ex. 5; *see* D.I. 1 ¶98.

defamatory facts: (1) that Grosz was an investor rather than a lender; and (2) that Toptal sued Grosz due to his investment in the company.[90]

Bloomberg argues referring to Grosz as an investor is neither false nor defamatory. Bloomberg reasons that a convertible noteholder can convert their note purchase to equity; thus, it is colloquially acceptable to refer to convertible noteholders as investors.[91] Toptal characterizes Grosz's interest in Toptal as a lender, and eventually the holder of a matured note, and contrasts this with the definition of investor, "a person or organization that buys securities or property in order to receive a profit."[92] Further, Toptal asserts that use of "investor" within the context of the Article "communicates that Grosz paid money for equity, thereby blaming Toptal for the fact that Grosz never received equity."[93]

The Complaint alleges that the above statement is false because it suggests that Grosz's "bet" of $1 million led to the Nevada litigation rather than Grosz's bad faith conduct and contractual violations.[94] Bloomberg contends it is not "substantially false" for the Article to suggest that Grosz's investment resulted in the Nevada litigation.[95] Bloomberg maintains that the Article includes "substantial detail into

---

[90] D.I. 17 p.14.
[91] D.I. 13 p. 21-22 [citing *Ramco Asset Mgmt., LLC v. USA Rare Earth, LLC*, 2024 WL 1716399, at *1 (Del. Ch. Apr. 22, 2024) ("invested…through the purchase of convertible notes"); *Valhalla Partners II, L.P. v. Vistar Media, Inc.*, 2024 WL 5039563 (Del. Ch. Dec. 9, 2024) (using investor and noteholder interchangeably)].
[92] D.I. 17 p.14 (quoting *Investor*, Collins Dictionary, collingsdictionary.com/us/dictionary/English/investor). *See also* D.I. 17 p.15. n.3 (citing to *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, which distinguishes an equity investor from a lender "seeking return on a debt" 855 A.2d 1059, 1077 n.35 (Del. Ch. 2003)).
[93] D.I. 17 p.15.
[94] D.I. 1 ¶98.
[95] D.I. 13 p.22.

the parties' dispute" such that the average reader would understand that the Nevada litigation was a result of the parties' declining relationship.[96] Further, the Article recounts the litigation and its result.[97]

Finally, Toptal responds to Bloomberg's assertion that the statement is not defamation *per se* by arguing the statement "falsely charges Toptal with suing an early investor" to evade equity conversion on Grosz's note.[98] Toptal suggests this "maligns Toptal in its business – as demonstrated by the prospective employees and business partners who have cited Bloomberg's reporting as a reason for not engaging with Toptal."[99] To support this argument, Toptal cites to several Delaware cases. In two of these cases, the Court explicitly finds that statements directly impacting the defamed party in their professional capacity are defamatory *per se*.[100] Toptal also cites to *Jacques-Scott v. Sears Holding Corp.* where, in contrast to the other cases, the Court granted dismissal for failure to state a claim because the alleged defamatory statements "merely show[ed] opinions and dislike of plaintiff" by insulting and name-calling the plaintiff.[101]

---

[96] *Id.*
[97] D.I. 13 Ex. 5 p.1.
[98] D.I. 17 p.17.
[99] *Id.*
[100] *Feldman,* 2024 WL 4263931, at *2, 6 (holding defendant's statements, which were knowingly false when sent to publication media, constituted defamation *per se* because the statements alleged plaintiff "schemed" and "cheated" in his professional capacity); *Meades v. Wilmington Hous. Auth.*, 2006 WL1174005, at * (Del. Super. Apr. 28, 2006) (finding statements accusing plaintiff of "mishandling…funds" and "misappropriating...property" in his employment position established defamation *per se*.")
[101] *Jacques-Scott v. Sears Holding Corp.*, 2011 WL 1059704, at *8 (D. Del. 2011).

20

Concerning the Article's use of the terms "investor" and "bet," the Court must interpret these words "in their plain and natural meaning and understand them as would a person of average intelligence and perception."[102] In *Ramunno v. Cawley*, the Delaware Supreme Court reversed the Superior Court's decision to sidestep an interpretive debate and instead rule on the pleadings that the "gist of [the] description was accurate."[103] The *Ramunno* Court acknowledged that its duty to draw reasonable inferences in favor of the non-moving party in congruence with the rule of interpretation stated above did not warrant dismissal on the pleadings.[104] The interpretative debate in *Ramunno* centered around whether stating that "some" houses were occupied by tenants was a false way to describe only one house being occupied, or if it was merely an immaterial error of an otherwise true statement.[105]

The statement at issue must be read in the framework of the whole Article as well as in the context of the Nevada litigation because a statement that is defamatory based solely on its content could be found incapable of defamatory meaning in light of its context.[106] A portion of the Article details the Nevada litigation. It mentions the claims Toptal brought against Grosz and Mechanism, the affirmative defenses raised by Grosz and Mechanism, the jury's verdict, and finalized damages owed by

---

[102] *Ramunno*, 705 A.2d at 1035-36.
[103] *Id.* at 1035.
[104] *Id.* at 1035-26.
[105] *Id.*
[106] *See e.g.*, *Images Hair Sols Med. Ctr.*, 2013 WL 6917138, at *4-5.

21

Grosz and Mechanism.[107]  The final section of the Article discusses Grosz's conduct which led to Toptal's initiation of the Nevada lawsuit, including Grosz's pitch to "The Information," a news platform, to run an article in hopes the "bad press would drive away customers."[108]

It is also pertinent to consider the Article's use of "investor" in relation to the full Article.  The Article characterizes Grosz's "investments" as a "form of debt – a convertible note that converts to equity when a startup raises more cash."[109]  It also explains the equity conversion as occurring "when Toptal convert[s] from a limited liability company to a corporation"[110]

The Court finds this statement survives dismissal.  First, Toptal alleges characterizing Grosz as an "investor" is false.  In accordance with *Ramunno*, the Court acknowledges its duty to draw a reasonable inference in favor of Toptal in determining how the reasonable reader would interpret "investor."  Second, Toptal adequately pleads the statement is substantially false because it could suggest to the reasonable reader that Grosz's "bet," and not his misconduct, led to the Nevada litigation.  Finally, Toptal sufficiently pleads defamation *per se* by alleging the statement maligned its business by conveying the idea to prospective colleagues that Toptal sued Grosz to avoid an equity conversion.  Additionally, to support its

---

[107] D.I. 13 Ex. 5 p.1.
[108] *Id.* Ex. 5 p.4.
[109] *Id.* Ex. 5 p.2.
[110] *Id.* Ex. 5 p.1.

defamation *per se* claim, Toptal specifically pled to two occasions in which a colleague cut ties with Toptal because of the Publications.[111] On its face, the Complaint does not suggest this statement is merely expressing an opinion or dislike.

## 2. *Investor Outlay Statements*

The next statement Toptal finds false and defamatory from the Article is "the startup [Toptal] has denied early investors a return by refusing to switch their decade-old convertible debt commitments into equity, tying up their holdings even as the company has flourished. Without equity, they can't sell their interest in Toptal, making their outlay worth little more than the day they invested."[112] The Revision, only impacting the second portion, states "[w]ithout equity, their outlay is worth little more than the day they invested."[113] Toptal raises concerns that this statement (1) falsely represents that Toptal was to blame for early investor's holdings being "tied up" in the company and (2) incorrectly reports the amount that Grosz made back from his note.[114]

Bloomberg argues the first portion of the statement is "substantially accurate" because the noteholders' convertible debt instruments "were not otherwise available to invest."[115] Bloomberg further contends the statement, if not provable, is certainly

---

[111] *See* D.I. 1 ¶¶ 109, 129-30.
[112] D.I. 17 p.18 (citing D.I. 1 ¶100, Ex. 6).
[113] D.I. 1 Ex. 6.
[114] *Id.* p.18-19; D.I. 1 ¶ 100.
[115] D.I. 13 p.23-24.

23

not defamatory because it "simply reflects the Notes' contractual requirements."[116] Toptal responds that the statement "falsely blames" Toptal for Grosz's decisions to lend money to Toptal, to not convert his note to equity before the option lapsed, and to not accept Toptal's tender of principal and interest. Toptal also contends it was false for Bloomberg to report that Grosz "can't sell [his] interest in Toptal," because Grosz did not have an interest in Toptal. [117]

The Court finds the Complaint adequately pleads the defamatory nature of this statement. Toptal alleges the statement's false representation that Grosz had an interest in Toptal to sell.[118] Further, Toptal pleads the statement would cause a reasonable reader to hold Toptal accountable for Grosz's independent decisions which left Grosz with no equity conversion nor principal and interest on his note.[119] These allegations are sufficient to support the statement's Rule 12(b)(6) survival.

Bloomberg asserts reading the statement "worth little more" with context demonstrates that the 4% annual interest that Toptal offered Grosz is in fact "worth little" when compared to the $100 million Grosz could have received in equity with Toptal estimated to be worth $1 billion.[120] Bloomberg argues if it had reported in a more straight-forward fashion "that Grosz was disappointed to receive $336,000

---

[116] *Id.*
[117] D.I. 17 p.19.
[118] D.I. 1 ¶ 97.
[119] *Id.* ¶ 100.
[120] D.I. 13 p.24.

instead of $100 million" the statement's impact on the reader would not change. [121]

Bloomberg can establish this statement is "substantially true" if it can show that tweaking the statement to provide "precise truth" does not change the average's reader's interpretation of the original statement.[122]  Toptal disputes this because, according to Toptal, $1,336,000 is a 34% profit on Grosz's note and that "reasonable people" could find this to be a significant profit rather than "worth little more" than Grosz's initial note.[123]

Bloomberg argues that the statement "worth little more" is an unactionable opinion.[124]  Citing to *Ramunno*, Toptal disputes this claim arguing that Bloomberg failed to disclose all facts necessary for the average reader to appreciate the truth behind its "worth little more" statement."[125]

In *Ramunno*, the Delaware Supreme Court reversed the dismissal of a defamation action by the lower court holding that it "failed to recognize the potentially defamatory factual basis imbedded in the statement," and reasoned that,

> [A]n opinion may often imply an assertion of objective fact and, if the implied fact may be found to be false the trier of fact may find the plaintiff to have been libeled….Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may

---

[121] *Id.*
[122] *See Riley*, 529 A.2d at 253-54 (holding the article's suggestion that plaintiff-politician was using "golf outings" to discuss future projects with developers was "substantially true," despite not being precisely accurate, because plaintiff conceded to attending meals with interested parties to discuss projects).
[123] D.I. 17 p.20.
[124] D.I. 13 p.25.
[125] D.I. 17 p.20.

still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications.[126]

As discussed above, the Delaware Supreme Court in *Riley v. Moyed* adopted the four-part test in *Ollman v. Evans* used to determine whether a statement is fact or opinion.

First, the Court looks to the common usage or meaning of the statement "worth little more." While the phrase is generally understood to indicate a small comparison of value, what that value is could be dependent on the reader's perspective. The parties' dispute demonstrates this: Bloomberg perceives "worth little more" as relating to Grosz's 4% annual interest compared to what a 10% equity interest in $100 million would be; whereas Toptal takes the phrase to refer to the 34% return Grosz received on his note which would be comparing a $336,000 profit to the original $1,000,000 Grosz gave. The plain language of the whole statement suggests the phrase could be interpreted either way because the statement mentions Grosz's return "without equity" and compares his initial "outlay" with his return.

Second, the Court analyzes whether the statement "worth little more" can be objectively verified as true or false. Considering both parties provided concrete numbers in their briefing, it seems that an objective comparison can be made. However, as displayed by the parties' contradictions, there are different

---

[126] *Ramunno*, 705 A.2d at 1036-37.

interpretations on what "worth little more" is referring to and if that value is actually "worth little more."

Finally, the Court considers the context of the statement "worth little more" within the entire Article as well as the social context surrounding the statement. As previously discussed, the context of the Article and the Nevada litigation provides necessary insight into the challenged statements. Considering the parties' interpretative dispute and the Court's duty to accept reasonable inferences in favor of Toptal, the Court currently finds this statement actionable.

Bloomberg contends the above statements are not defamatory *per se* because they merely report on "a corporation successfully enforce[ing] the terms of its note agreements."[127] Bloomberg cites to *Danias v. Fakis* to support its assertion that even if the statement is "untrue, it is not libelous *per se* to have charged [Toptal] with doing nothing more than an act [it] could properly and lawfully do."[128] In *Danias*, the Court held it was not defamatory *per se* for the defendant to spread a false rumor that the plaintiff informed Federal Immigration Authorities that a third person was illegally residing in the country.[129] The Court reasoned informing authorities of the presence of an illegal immigrant is not "unlawful or improper conduct."[130] Toptal opposes this argument and contends that the statement attacks Toptal's "integrity

---

[127] D.I. 13 p.25.
[128] *Id.* (citing *Danias v. Fakis*, 261 A.2d 529, 531 (Del. Super. 1969)).
[129] *Danias*, 261 A.2d at 531.
[130] *Id.*

27

and fitness" by accusing it of "withholding funds from investors and failing to pay the return it owes."[131] Toptal asserts this is clearly defamation *per se*.[132]

The Court finds that the statement on its face could suggest more to a reasonable reader than merely a report that Toptal was acting lawfully and properly by complying with the Convertible Note Agreements. The Court in *Danias* held the specific conduct purported in the alleged defamatory statement could not be defamatory *per se* because it was lawful conduct. The same is not true here. A facial reading of the statement does not make it clear to the Court that the Article simply suggests Toptal sees its contracts through. As previously discussed, the Complaint also alleges specific circumstances in which professionals in Toptal's field cited to the Article as the basis for not working with Toptal. For these reasons, the Court finds Toptal adequately pleads defamation *per se* as to these statements.

### 3. *Equity Rights Statements*

Toptal also alleges the following statements from the Article are false and defamatory, "Grosz's deal included rights to around 10% of the company after its first equity financing. But Grosz didn't get his stake: Toptal never raised more equity, and a conversion never happened."[133] The Revision changed the second sentence to: "But Grosz didn't get that stake: a conversion never happened."[134]

---

[131] D.I. 17 p.21-22.
[132] *Id.*
[133] *Id.* p.22 (citing D.I. 1 ¶102).
[134] D.I. 1 Ex. 6.

28

The Complaint alleges stating that Grosz and Toptal had a "deal" to give Grosz "rights to 10% in equity in Toptal" is false because the Nevada Court held that Grosz "*never* acquired a right to obtain equity in Toptal."[135] In response, Bloomberg urges review of the statement in its entirety maintaining it relays to the reader that Grosz's rights were triggered only "after [Toptal]'s first equity financing," the first equity financing did not occur, and, thus, "conversion never happened."[136] Toptal asserts, if that is what Bloomberg was intending to relay, it should have also reported that "the note agreement expressly authorized everything Toptal did" and that Grosz's conversion rights expired in 2014.[137]

Bloomberg argues that the statement simply conveys that Toptal "enforced its contract, particularly in an Article that expressly stated that it defeated a breach claim brought by its counterparty."[138] However, the parties dispute whether the Article's context refers to the breach of contract claim pertaining to the Advisor Agreement,[139] or the Convertible Note Agreements.[140] The Article states, "in affirmative defenses against Toptal, Grosz and Mechanism alleged…breach of contract of his advisory agreement. Toptal was not found liable."[141] This is the Article context Toptal relies on in maintaining that this does not support Bloomberg's argument because the

---

[135] D.I. 1 ¶102.
[136] D.I. 13 p.26.
[137] D.I. 17 p.23-24.
[138] D.I. 13 p.26-27.
[139] D.I. 17 p.24.
[140] D.I. 24 p. 17 n.6.
[141] D.I. 13 Ex. 5.

29

breach claim in the Nevada litigation concerned Grosz's Advisor Agreement, not the Convertible Note Agreements.[142]  The Court agrees this statement would do little to support Bloomberg's argument.

Meanwhile, Bloomberg asserts it is clear from the context of the statement, "the judge made an additional ruling in October on a pre-trial motion filed by Toptal: Grosz's ability to demand any equity stake had expired when his convertible notes hit their maturity date in 2014," that the Article conveys that Toptal did not breach its Convertible Note Agreements with Grosz.[143]  This statement imparts to the reader the Nevada Court's ruling that Toptal did not owe equity to Grosz at the time of litigation.  However, it does not affirmatively support the notion that Toptal enforced the Convertible Note Agreements.  To the Court, this is another example of an interpretative dispute which must be weighed in favor of Toptal at the motion to dismiss stage.

It appears to the Court that this statement withstands the instant Rule 12(b)(6) Motion.  Toptal properly alleges the falsity of the statement's representation that Grosz and Toptal had a "deal" giving Grosz "rights to 10%."  Further, the Court finds it is reasonably conceivable from Toptal's pleadings that the average reader could interpret the statement to propose that Toptal failed a duty to Grosz under the

---

[142] D.I. 17 p.24.
[143] D.I. 24 p.17 n.6.

Convertible Note Agreements to raise more equity. For these reasons, the Court finds Toptal's Complaint adequately pleads another false and defamatory statement.

4. *Potential Conversion Statements*

Finally, Toptal alleges the following statement from the Article is false and defamatory, "Grosz could still see an equity conversion – Toptal raising more money would trigger one."[144] Toptal contends the statement is false because the Nevada court held "Grosz chose not to exercise his option before it expired, meaning the equity provisions in his agreement ceased to operate and could no longer be triggered."[145]

The Revision rewrites this statement as: "Grosz cannot currently expect an equity conversion, unless his ongoing appeal to overturn part of the court's decision is successful."[146] Bloomberg contends the Revision does not make the original statement false and "at most conveys a 'minor inaccurac[y]'" of a substantially true statement.[147] Bloomberg emphasizes that the Revision is a clarification of the original statement "both communicat[ing] that Grosz could only receive equity in Toptal subject to a condition precedent."[148] Bloomberg further argues the context of the entire Article relays to the reasonable reader that the Nevada Court's ruling

---

[144] D.I. 17 p.24 (citing D.I. 1 ¶104).
[145] D.I. 17 p. 24.
[146] D.I. 1 Ex. 6.
[147] D.I 13 p.27 (citing *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) ("The common law of libel takes but one approach to the question of falsity, regardless of the form of communication. It overlooks *minor inaccuracies* and concentrates upon substantial truth.") (emphasis added)).
[148] D.I. 13 p.28.

hindered Grosz's ability to demand equity.[149] Toptal maintains that the Revision is "conclusive proof of falsity" because the Revision contradicts the original statement.[150]

The Nevada Court, in granting summary judgment as to Grosz's breach of contract claim against Toptal, held the Convertible Note Agreements did not provide Grosz with a "perpetual option" to convert to equity.[151] The Nevada Opinion reasoned that Grosz did not elect to convert before the maturity date; therefore, Toptal did not breach the Convertible Note Agreements by refusing to perform in response to Grosz's post-maturity date elections.[152] The Article states this ruling and that it is under appeal.[153]

The pleadings show that, in the Nevada litigation, Grosz raised on appeal the issue of equity conversion after the maturity date.[154] The Revision conveys that Grosz's ability to convert is contingent on the ongoing appeal.[155] The parties dispute over whether both the original and Revised statement convey the same message to the reasonable reader – if Grosz could still see an equity conversion.

---

[149] D.I. 17 p. 27 (citing D.I. 1 Ex. 6 ("[T]he judge made an additional ruling in October on a pre-trial motion filed by Toptal: Grosz's ability to demand any equity stake had expired when his convertible notes hit their maturity date in 2014.")

[150] *Id.* p.25.

[151] D.I. 1 Ex. 1 p.6.

[152] *Id.* Ex. 1 p.6-7.

[153] D.I. 13 Ex.5.

[154] *See* D.I. 13 Ex. 4 p.11 (A principal issue Grosz raises on appeal is "[w]hether the District Court erred in concluding that an optional conversion right in a Convertible Note providing the noteholder with the option to convert his investment to equity "[a]t any time on or after the fifteenth (15th) day prior to the Maturity Date" expires on the Maturity Date.")

[155] D.I. 1 Ex. 6.

Whether the context discussed above relays to the average reader the likelihood of Grosz receiving equity in Toptal is a question for a later day. At this stage, the Court finds that Toptal has adequately pled the false and defamatory nature of both the original statement and the Revision.

As to the above challenged statements, the Court finds that Toptal has more adequately pled false and defamatory statements than the cases in Delaware courts whose defamation claims have been dismissed at this early stage of litigation.[156] Moreover, Toptal alleges several circumstances of the Article resulting in Toptal's injured reputation.[157] Whether changes to the Article would have the same effect on readers and if the "gist" of the Publications are substantially true are issues that still stand and should be considered with a more developed record of the case.

## The Column

Unlike the Article, Levine's commentary in the Column is not defamatory. The Complaint alleges the Column is false and defamatory for several reasons: (1) it repeated defamatory statements from the Article; (2) it is titled *The FTC Comes for Noncompetes*, yet the Article does not concern noncompetes; and (3) it includes that

---

[156] *Page v. Oath Inc.*, 270 A.3d 833, 836 (Del. 2022) (affirming Superior Court's dismissal because the article was "substantially true"); *Owens v. Lead Stories,* LLC, 2021 WL 3076686, at *12-13 (Del. Super. July 20, 2021) (holding challenged statements "do not convey facts that are untrue or capable of a defamatory meaning because they do not injure the plaintiff's reputation); *Holmes v. News-Journal Co.*, 2015 WL 1893150, at *2 (Del. Super. Apr. 20, 2015) (holding the article was substantially true); *Images Hair Sols. Med. Ctr.*, 2013 WL 6917138, at *4 (holding the challenged statements did not surpass the *Ward* three-part test evaluating the statements' content, verifiability, and context); *Riley*, 529 A.2d 148 (finding the challenged statements were not defamatory because they were either expressions of opinion or "substantially true").
[157] D.I. 1 ¶¶ 109, 129-31.

33

"Grosz 'rejected' the attempt to pay him an amount equal to principal and accrued interest" without informing the reader of the Nevada Court's ruling that Toptal did not breach the Convertible Note Agreements.[158]

As to the first point, the Column's use of the Article's alleged defamatory statements does not automatically make the Column defamatory. Just as the Court did for the Article, it considers the challenged statements in the context of the entire Column.[159] In *Ramada Inns v. Dow Jones & Co*, the Court held excerpts from a prior article were protected because they were "minimal references which merely provide[d] context."[160] Similarly, the Column utilizes excerpts from the Article as a "fact pattern" to distinguish the standard convertible-debt payout scenario.[161]

Second, the title of the Column does not make the statements on Toptal defamatory. The Column goes through several topics in addition to noncompetes – convertible bonds being one of them.[162]

Finally, the Column does not indicate that Toptal breached the parties' agreement. In fact, the Column states that Toptal's attempt to pay Grosz back his principal plus interest and Grosz's choice to reject that was "reasonable, on both sides."[163] Further, the Column maintains that Toptal keeping Grosz's convertible

---

[158] D.I. 1 ¶¶ 111-14.
[159] *Ramada Inns, Inc. v. Dow Jones & Co., Inc.*, 543 A.2d 313, 327 (Del. Super. Sept. 30, 1987).
[160] *Id.* at 328.
[161] D.I. 13 Ex. 6 p.8 ("…but I have never seen this fact pattern before:") (original emphasis).
[162] *See Id.* Ex. 6.
[163] *Id* Ex. 6 p.9.

bond outstanding is "another entirely possible upside case," and includes that Toptal had a "choice" to keep the outstanding convertible bond or convert it to equity.[164] Therefore, there was no need for the Column to bring up the Nevada litigation's outcome.

The Column dedicates a very small portion to discussing Toptal. Besides the Article excerpts, the entire section is three paragraphs of Levine's commentary on convertible-bonds and the Grosz-Toptal scenario.[165] Levine's commentary never calls Grosz an investor nor implies that Grosz's "bet" landed him on the receiving end of a lawsuit. The commentary does not say or imply that Toptal denied early investors a return by refusing to switch their convertible debt into equity nor does it comment on the value of Grosz's bond.

In contrast to the Article, the Column does the following: (1) accurately conveys the relationship of the parties; (2) spells out the terms of the parties' agreement; (3) makes clear that Grosz was not entitled to an equity stake unless Toptal sought out more investor cash; and (4) clearly sets forth the parties' rights and obligations to each other under the deal.

---

[164] *Id.* Ex. 6 p.8-9.
[165] *See Id.* Ex. 6 p.8-9.

Applying *Ramunno* leads to but one conclusion: the Column includes only Levine's opinion which is rooted in objective fact.[166] Therefore, the Column is not false nor defamatory.

The next question is whether the Column's hyperlink to the Article constitutes an actionable republication. The Court is unable to find Delaware cases applying Delaware law to the question of republication.[167] In *Perlman v. Vox Media*, the Court of Chancery, applying California law, denied a motion to dismiss.[168] After *Perlman* was transferred to this Court, Judge Wallace, applying California law, concluded that there was no republican by hyperlink because "to find that a publication constitutes a new edition due to its new audience, the publication itself must be altered, not its marketing."[169] This decision follows the body of case law that stands for the proposition that liability for republication depends on the republished article containing independent defamatory statements or that the republished article restated the prior defamatory statements.[170]

I find that, beyond the link, the Column did not restate the prior defamatory statements. Given that I have concluded that the Column does not contain any

---

[166] *Ramunno*, 705 A.2d at 1036-37.
[167] *Incyte Corp. v. Flexus Biosciences, Inc*, 2017 WL 7803923, at n.39 (Del. Super 2017).
[168] *Perlman, et. al. v. Vox Media, Inc.*, 2015 WL 5724838, at *20 (Del. Ch. Sept. 30, 2015).
[169] *Perlman v. Vox Media, Inc.*, 2020 WL 47303406, at *2 (Del. Super. Aug. 14, 2020).
[170] *See Lokhov v. Halper*, 995 F.3d 134, 142 (4th Cir 2021); *In Re Phila. Newspapers, CCL*, 69 F.3d 161 (3rd Cir 2012); *Mirage Entm't, Inc v. FEG Entretenimientos S.A.*, 326 F.Supp.3d 26 (S.D.N.Y. 2018).

independent defamatory statements, there is no liability related to the Column merely because the Article was hyperlinked to it.

Toptal's claims against the Column are **DISMISSED**.

### C. Defamation by Implication

Much of Bloomberg's brief addressing defamation by implication applies New York's heightened standard. Because the Court has already addressed that New York law does not apply, the Court will not address this portion of Bloomberg's argument.

Delaware case law lacks a developed defamation by implication standard. However, this Court has applied a Third-Circuit standard which acts to heighten the actual malice standard applicable in a public figure case.[171] The standard holds that when alleging defamation by implication, the plaintiffs must "show something that establishes defendants' intent to communicate the defamatory meaning," or "reckless disregard for the defamatory meaning of a statement."[172]

While Toptal's Complaint alleges Bloomberg acted with actual malice, the parties' briefing does not mention whether Toptal is a public figure. The Complaint alleges that Bloomberg "knew, or at least recklessly disregarded" the falsity of the published statements because "the false allegations are contradicted by publicly filed

---

[171] *ShotSpotter Inc.,* 2022 WL 2373418, at *14 ("The standard for malice is heightened in a defamation by implication case.")
[172] *Id.* (quoting *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d. Cir. 2013)).

court documents in the Nevada court case, many of which Du Val had directly provided to McBride."[173]

If at a later date the Court finds the actual malice standard is applicable, it will apply the heightened standard discussed above and required by a defamation by implication allegation under Delaware law. At this time, the Court finds Toptal has adequately pled Bloomberg's intent to defame or reckless disregard to the statements' defamatory meanings.

**D. Fair-Report Privilege**

The fair-report privilege safeguards media outlets from liability for publishing "an accurate and fair abridgment of a judicial proceeding."[174] An accurate account means the reporting "conveys to the persons who read it a substantially correct account of the proceedings.[175] To remain fair, the publication must ensure "nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it."[176] The privilege only applies to "reports about proceedings, not the underlying facts."[177] The justification for this privilege is the "interest of the public in having information made available to it of what occurs in

---

[173] D.I. 1 ¶145.
[174] *Read v. News-Journal Co.*, 474 A.2d 119, 121 (Del. 1984) (citing Restatement (Second) of Torts §611 (1976)).
[175] Restatement (Second) of Torts § 611 cmt. f.
[176] *Id.*
[177] *U.S. Dominion, Inc. v. Fox News Network, LLC*, 293 A.3d 1002, 1060 (Del. Super. Mar. 31, 2023).

such proceedings."[178]  Examples in Delaware case law demonstrate application of the fair-report privilege.[179]

Bloomberg argues that the Publications give a "substantially accurate" description of the Nevada litigation and, therefore, the fair-report privilege immunizes the Publications from suit.[180]  Bloomberg points specifically to the Publications' recitation of "the jury verdicts, quoted emails 'shown in court,' and 'cit[ing] a February 2024 docketing statement that Grosz filed with Nevada's Supreme Court."[181]  Moreover, Bloomberg – citing to the Nevada Litigation's Complaint, Grosz's countersuit, and Grosz's appeal statement – asserts the Publications accurately report the records of the Nevada litigation.[182]

Toptal contends the fair-report privilege does not apply because the challenged statements were not reporting on the Nevada litigation's proceedings.[183]  Toptal asserts that merely mentioning the Nevada litigation is not enough to invoke the privilege.[184]

---

[178] *Read*, 474 A.2d at 121.
[179] *See Brisco v. Delaware State Police*, 2024 WL 1575105, at *3-4 (Del. Super. Apr. 11, 2024) (finding the news publication was a fair and accurate reporting of the police report it was writing on, even though the information in the police report was incorrect);*Read*, 474 A.2d at 121 (holding "a comparison of the news article with the Opinion being reported fail[ed] to disclose an unfairness or inaccuracy sufficient to overcome defendants' fair report privilege." (citing Restatement (Second) of Torts § 611 (1976))).
[180] D.I. 13 p.36.
[181] *Id.* p.35.
[182] *Id.*
[183] D.I. 17 p. 31.
[184] *Id.*

While a portion of the Article recounts the judicial proceedings of the Nevada litigation, the challenged statements concern underlying facts – the nature of Grosz and Toptal's relationship and their Convertible Note Agreements.

In Delaware, the fair-report privilege is generally applied where either the sole focus of the publication is the privileged proceeding or the challenged statements are directly reporting on it.[185] The Publications do more than just report on the Nevada litigation. They discuss underlying facts and provide commentary.

The only challenged statement that could be considered a direct account of the litigation is that "Grosz cannot currently expect an equity conversion, unless his ongoing appeal to overturn part of the court's decision is successful." The Nevada Court ruled on summary judgment that Grosz's ability to convert had lapsed.[186] The appeal referred to in the above challenged statement is Grosz's appeal from this summary judgment decision.[187] However, this statement is a revision.[188] As stated above, Toptal expresses concern with the original statement which is entirely underlying fact and does not reference the Nevada litigation.[189]

---

[185] *See Brisco*, 2024 WL 1575105, at *2-4 (the challenged statement came directly from the report issued by Delaware State Police); *Page*, 2021 WL 52472, at *3-4, *aff'd*, 270 A.3d 833 (applying the fair-report privilege to an article reporting on a government investigation); *Read*, 474 A.2d at 120 ("The Complaint shows on its face that the news article was privileged and that the privilege was not abused.")

[186] *Id.* p.27 (citing D.I. 1 Ex. 1, Nevada Court's Order Granting, in part, Toptal, LLC's Motion for Summary Judgment).

[187] D.I. 13 p. 7 (citing D.I. 13 Ex. 4, Grosz's Civil Appeal Docket Statement).

[188] D.I. 1 ¶ 122.

[189] D.I. 17 p.24-26; *see* D.I. 1 ¶ 104.

At this point, Bloomberg has not shown the Court that the challenged statements are "fair and accurate" accounts of the Nevada litigation such that the fair-report privilege immunizes Bloomberg from this suit.

## CONCLUSION

The Court finds, in consideration of the above contentions and relevant Delaware case law, Toptal pleads sufficient allegations of defamation and defamation *per se* as to the alleged false and defamatory statements in the Publications.

For the above reasons, the Court **DENIES** Bloomberg's Motion to Dismiss as to the Article and **GRANTS** Bloomberg's Motion to Dismiss as to the Column.

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc:    Counsel of Record via *File&ServeXpress*